**DUNLAP, Acting Collector of Internal Revenue, v. OLDHAM LUMBER CO.**

No. 12660.

United States Court of Appeals
Fifth Circuit.

Jan. 6, 1950.

Rehearing Denied March 13, 1950.

Irving I. Axelrad, Sp. Asst. to Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., William P. Fonville, Asst. U. S. Atty., Dallas, Tex., for appellant.

Sam G. Winstead, Dallas, Tex., for appellee.

Before HUTCHESON and RUSSELL, Circuit Judges, and DOOLEY, District Judge.

RUSSELL, Circuit Judge.

In the trial Court the appellee successfully maintained its suit to recover excess profit taxes and declared value excess profit taxes paid under protest for the years 1944 and 1945, by the finding of that Court that the losses realized by it in those years on the sale of lots were ordinary losses rather than losses resulting from the sale of capital assets, as had been determined by the Commissioner.

The case was heard upon a stipulation of facts and oral testimony of the officers of the complainant taxpayer and of a revenue agent. The facts are not in substantial dispute. A summary of the stipulated facts appear in the footnote.[1] From the unchallenged testimony of taxpayer's officers it was established that these lots at the date of acquisition in 1928 were vacant lots in a platted and approved subdivision; that while the streets had been cut through and graded, no other improvements had been made; there was no sewerage or water available, but the taxpayer believed that as a result of the annexation of the property into the City of Dallas, the City would finance the installation of these utilities. There were approximately 300 or 400 lots in the subdivision; some of which were acquired by other people at or about the same time as taxpayer secured its lots. Taxpayer's president testified: "We thought that (the lots) would be valuable assets to our lumber business; we would have these lots available to sell to our customers or contractor-builder customers for building houses upon, and thereby we could control the lumber business and sales on a less competitive basis." He never abandoned this plan. However, because the subdivision was not taken into the city, water and sewerage facilities were not installed and the lots could not be profitably sold. The taxpayer made other efforts to work out a plan for securing the utilities and talked with city officials in an effort to have them secure the development of the section. During some years the real estate market in the area was depressed, but the officer talked with at least three builders and one real estate agent during the period from 1928 to 1944 in an effort to dispose of the lots. During the period between 1938 and 1944, taxpayer financed the acquisition of numerous lots by those building houses. This was done by making a deposit on each lot which would be repaid upon the completion and sale of the building. These transactions facilitated the sale of lumber and building materials. As to the period between 1937 and 1944, the taxpayer's President could recall the sale of only "one or two other lots," in either 1937 or 1938. During this year lumber sales were approximately $300,000. Two or three other pieces of improved property, houses and lots, were sold in the years 1935 and 1937 as the result of foreclosures. The actual sale of the lots in question was made by a real estate agent to whom a commission

1. The taxpayer is a Texas corporation, having its place of business in Dallas County, Texas. Its charter provides its purpose for which it is formed as "the buying and sale of lumber, building materials, coal and agricultural products of any description." The taxes sued for were paid as the result of disallowance by the Commissioner of Internal Revenue of losses sustained in the tax years 1944 and 1945, the losses being disallowed on the ground that the lots in question, sold in the years in question, constituted capital assets, losses from the sale of which are capital losses limited as to deductibility by the provisions of Section 117 of the Internal Revenue Code, 26 U. S.C.A. § 117. The facts relating to the acquisition and sale of the lots in question are that on February 27, 1922, plaintiff purchased eleven vacant lots in the J. D. Hayes Subdivision. Thereafter in 1922 the plaintiff erected houses on said lots which were sold in 1922 and 1923. The purchase price of the lots was represented by long term notes. In April, 1923, plaintiff exchanged a part of these notes plus cash for vacant lots, numbers 24 and 25, Block 83, in Dallas County. In September, 1924, plaintiff traded lots 24 and 25 plus cash for twenty-four houses and some vacant lots in Lincoln Park Addition, Dallas County, Texas, and shortly thereafter, spent $505.03 for sidewalks and street improvements. From September, 1924, to April, 1928, plaintiff rented said houses to Negroes. In April, 1928, plaintiff traded the Negro houses and vacant lots in the Lincoln Park Addition plus $7,381.79 in cash for fifty vacant lots in Bluebonnet Addition, Dallas County, Texas, and shortly thereafter, plaintiff spent $500 for sewer laterals on said lots. Plaintiff had a cost or adjusted basis in the lots sold in 1944 and 1945 of $23,272.05. It is stipulated that if as complainant contends the loss sustained in the tax years from the sale of the lots is not limited by the provisions of Section 117, complainant is entitled to recover the amount sued for, and if it be determined that the losses are limited by the provisions of such section, the complainant is not entitled to recover.

**783**

was paid, and the sale resulted from a call and offer to buy the lots now under consideration. Complainant, doing a very substantial lumber business, with some fifty employees, had no real estate department, nor any employee charged particularly with the promotion and consummation of real estate sales.

■ We of course recognize the rule that if there is substantial evidence to support the finding of the trial Court that the lots in questions were not "capital assets" and the finding is not clearly erroneous this finding should be sustained, but in this case the evidence is wholly insufficient to sustain the finding of the Court and its judgment directing a refund to the taxpayer.[2] The

real question for determination is whether the 34 lots, 27 of which were sold in 1944, and the remainder in the year 1945, can be said to have been "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," so as not to be included within the term of capital assets as defined in Section 117 of the Internal Revenue Code, 26 U.S. C.A. § 117. Stated differently, were the lots capital assets, or were the losses resulting from the sale of the lots ordinary business losses as contended by the taxpayer.

■ It may be conceded that in voluminous tax litigation which has involved determination of the status of property as

2. The Court orally announced: "Well, the difference between you gentlemen is largely based upon a word which is not underscored in the statute—one would italicize it and the other would just leave it as it is.

"What Congress had in mind in Section 117 presents a difficulty in unraveling the respective positions taken by the income tax authorities and the citizen with reference to whether a transaction was capital gain or ordinary income. One goes back as far as the parent which gave birth to the corporation to determine what the charter issuing sovereignty said could be done under the charter.

"We have an interesting case, which has become the law all over the nation, known as the Long Bell Lumber Company. That permits such a latitude—reasonably—I think, with reference to what a charter institution may engage in under its charter without running the risk of having that charter taken away from it by these issuing authorities. Ultra vires may be pleaded by certain parties, but not by all parties. We cannot with justice, I think, claim that what the Oldham Lumber Company did was ultra vires. It was in the ordinary course of business. The witnesses who have taken the stand do not run counter to the written stipulation of the parties, which was quite agreeable to the Court, and speaks well of the talent and learning of each side. Those authorities of the corporation testify that these lots were acquired for the purpose of assisting them in the sale of lumber, such lumber to be purchased from them by those who would erect houses on them, and who would buy lots from them. It is a close question, but I doubt, gentlemen, that those lots

were capital assets within the meaning of the income tax law. I think what was done there, and what was hoped to be done there, was largely delayed, to say the least of it, by the failure of the municipality to run connecting water facilities for those who might be interested in the purchase of the lots. The Lumber Company went so far as to build its own laterals upon the lots so as to connect with those same water facilities when the city should place the main line out there. It was a larger venture than the Lumber Company had engaged in before, apparently, in that particular respect, but the testimony of the witnesses show that the business of the Oldham Lumber Company has continued to increase with the years, so that it has reached a large volume in the last year or so, larger than ever before, perhaps due to the perspicuity and vision of those who are in the main.

"I find, gentlemen, that as a fact, and in addition to what I have already said, that these lots acquired in the twenties and sold in 1944 at a loss, as stipulated by the parties, were not capital assets, but were losses that are deductible under the income tax statute."

The Court thereafter denied the motion of the complainant for additional findings of fact, among which was proposed finding three that "During the time the lots in question were owned by plaintiff, such lots were held by plaintiff primarily for sale to customers in the ordinary course of plaintiff's trade or business, and for the purpose of increasing the sale of lumber and building materials. During this period, efforts were made by the plaintiff to dispose of the lots to customers in connection with its trade or business."

"capital assets," or otherwise, shifting positions have been taken by the tax gatherers and the taxpayers, depending upon their respective desires and the advantages to be obtained under the conditions with which they respectively found themselves surrounded. Nevertheless, certain well recognized tests for the determination of the status of property, as to whether "held by the taxpayer primarily for sales to customers in the ordinary course of his trade or business" have been laid down. Thus, a most important factor is continuity of sales and sales related activity over a period of time.[3] As well said in Snell v. Commissioner, as to the "business" referred to in the statute, "the word, notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time." Frequency of sales, as opposed to isolated transactions has been emphasized.[4] Also, the activity of the seller or those acting under his instructions or in his behalf, such as by improvements or advertisement to attract purchasers.[5] The extent or substantiality of the transactions have been relied upon,[6] and in other cases the reason for, the purpose, and the nature of the acquisition of the subject matter have been given consideration.[7] However, this Court has pointed out that the purpose of the acquisition of the subject matter is not as controlling as is the activity of the seller or those acting for him with reference to the property while held.[8]

When the acquisition, possession, and disposition of the lots in question, and the very limited similar transactions of the taxpayer, are tested by these well established principles, we think it clear that there is no evidence in the record legally sufficient to sustain the finding legally necessary to support the result reached, that the lots were held primarily for sale to customers in the ordinary course of the taxpayer's business. Certainly the sale of one or two unrelated lots in a five year period is not sufficient to establish any continuity of sales, nor does the evidence show any sales activity. At most, any sales shown are isolated transactions. Nor is there any showing of efforts to sell such as are usually expended by those engaged in the business of real estate sales, even if ancillary to the sales of building material. It may be remarked that the financing of the purchase of lots by others is an entirely different activity from the making of sales of one's own real estate. In so far as appears from the record the sales of the lots now actually in question were not made as a part of it, and did not forward in any way the primary business of the taxpayer. The evidence is wholly insufficient to show any sustained real estate business on the part of the taxpayer. Even if there could be any possible room for disagreement as to the above view of the evidence, clearly there can be no dispute of the proposition that under the evidence here there is no basis for a finding that there were sufficient sales transactions to show that such sales of real estate were an ordinary course of

3. Snell v. Commissioner, 5 Cir., 97 F.2d 891, 892; Fahs v. Crawford, 5 Cir., 161 F.2d 315; Brown v. Commissioner, 5 Cir., 143 F.2d 468; McFaddin v. Commissioner, 5 Cir., 148 F.2d 570; United States v. Robinson, 5 Cir., 129 F.2d 297; Greene v. Commissioner, 5 Cir., 141 F.2d 645, certiorari denied 323 U.S. 717, 65 S.Ct. 45, 89 L.Ed. 577; White v. Commissioner, 5 Cir., 172 F.2d 629; Harriss v. Commissioner, 2 Cir., 143 F.2d 279; 512 W. Fifty Sixth St. Corp. v. Commissioner, 6 Cir., 151 F.2d 942; Oliver v. Commissioner, 4 Cir., 138 F.2d 910; Richards v. Commissioner, 9 Cir., 81 F. 2d 369, 106 A.L.R. 249; Ehrman v. Commissioner, 9 Cir., 120 F.2d 607.

4. Harriss v. Commissioner, supra; Miller v. Commissioner, 9 Cir., 102 F.2d 476; Rogers v. U. S., 70 Ct.Cl. 159, 41 F.2d 865, 868.

5. Oliver v. Commissioner, supra; Richards v. Commissioner, supra; Snell v. Commissioner, supra.

6. Miller v. Commissioner, supra.

7. Kanawha Valley Bank v. Commissioner, 4 T.C. 252; Harriss v. Commissioner, supra.

8. Foran v. Commissioner, 5 Cir., 165 F.2d 705; Brown v. Commissioner, supra; see also, Fuld v. Commissioner, 6 Cir., 139 F.2d 465.

business of the taxpayer. Such sales as were shown were extremely infrequent, and utterly fail to establish any "ordinary course of business" of the taxpayer as to the sale of the lots. The conclusion is inescapable that the sale of the lots was most extraordinary and not at all ordinary, and there was no ordinary course of business as to lot sales. By the express terms of the statute property must not only have been "held primarily for sale," but also for sale in the "ordinary course of the business of the taxpayer." In these circumstances, we need not concern ourselves with any discussion of the word "customer." Under the circumstances here disclosed, the testimony as to the intention of the taxpayer in the acquisition of the lots is not legally material.

We conclude, therefore, that the legal effect of the evidence and the circumstances of this case are such as to impel a finding that the lots in question were capital assets, and that the contrary holding of the trial Court is clearly erroneous and should be set aside.

The judgment appealed from is reversed, with direction to enter a judgment in favor of the defendant.

Reversed.