JAY BURNS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25314.    Promulgated March 9, 1954.

*Alex P. Gaines, Esq.*, and *John E. Simpson, Esq.*, for the petitioner. *Thomas C. Cravens, Jr., Esq.*, for the respondent.

## OPINION.

Turner, *Judge*: This is another of those cases involving the sale of real estate by an individual where the question is whether the parcels sold were or were not capital assets, and in which the positions of the parties as to whether the real estate sold was held primarily for sale to customers in the ordinary course of the taxpayer's trade or business shift according to the gain or loss results of the sales.

It is the claim of the petitioner that beginning in 1925, up to and including the taxable years, he was engaged in the business of buying and selling Florida real estate; that all of the items of such property acquired by him, except the lots, in Highland Park, on which he built his home and 20 acres acquired at or about the same time for development into a citrus grove, were acquired for resale and were thereafter held by him primarily for sale to customers in the course of his real estate business, and as a consequence were not capital assets within the meaning of section 117 (a) of the Internal Revenue Code.[8] It is on that basis that he contends that losses sustained on the sale of the 40 acres of land in 1944, the sale of the Real Estate Exchange Building in 1946, and the sale of the Tampa lots in 1947, were not capital losses but ordinary losses, deductible in full in arriving at his net income for those years, and that the net loss arrived at in 1946, through the deduction in full of a loss on the sale of the Real Estate Exchange Building, was an operating net loss, subject to the carry-over and carry-back provisions of section 122 of the Internal Revenue Code.

---

[8] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1) * * *

With respect to the 40 acres sold in 1944 and the Tampa lots sold in 1947, the respondent takes the position that they were not held by petitioner primarily for sale to customers in the course of his business and that the losses sustained were capital losses, subject to the limitation provisions of section 117 thereon. With respect to the Real Estate Exchange Building, it is his position that that property was used by petitioner in his business of owning and renting office and business property, and the loss [9] sustained upon its sale, even though not a capital loss but deductible in full in the year sustained, was not an operating loss which comes under the carry-over and carry-back provisions of the Code.

Whether or not the properties sold by petitioner in the taxable years were held by him "primarily for sale to customers in the ordinary course of his trade or business" so as to prevent application of the limitations of section 117 of the Code on the deduction of capital losses, as he contends, is essentially a question of fact,[10] and it is his burden to prove and establish that the properties were in fact so held. The record from which that factual determination must be made is not at all satisfactory. In the main, petitioner's proof consists of his own general statements and conclusions and a statement of comparable conclusions by three witnesses called by him. We do have a statement of his recollections as to some items or parcels of property and the transactions with respect thereto. In that connection, however, he volunteered that his son was his "agent and conducted many properties," so that he himself might not be able to testify about specific details of "those negotiations." He offered none of the books and records which recorded his transactions and operations as they occurred, nor any information or data therefrom, and, as a consequence, we have no way of knowing whether they would tend to sustain or refute his claims made and conclusions stated. Whether the books and records are still in existence, or whether they have been lost or destroyed, we do not know. Just why his proof was so limited is not explained. As to specific conveyances in which the petitioner

---

[9] Although petitioner's allegation that he sustained a loss on the sale of the Real Estate Exchange Building was denied by the respondent, we find no proof either as to the cost or other basis or the selling price beyond some general approximations by petitioner as to its cost when construction was completed in 1926. On his 1946 return, however, he had fixed the amount of the claimed loss at $31,313.93, and the respondent, in his notice of determination, in dealing with a claimed net loss carry-back made by petitioner in claims for refund for 1944 and 1945, raised no question as to the sustaining of the loss or the amount thereof, but denied the carry-back claim on the ground that the resulting net loss was not an operating net loss. Such being the circumstances, and the respondent not only having made no point on brief that the claimed loss has not been proven, but, as in his determination, having taken the position only that the loss on the sale of the building was not an operating loss, we regard the sustaining of the loss and the amount thereof as admitted.

[10] *Chicago Title & Trust Co.* v. *United States*, (C. A. 7) 209 F. 2d 773.

was the grantee or grantor, we are largely left to depend upon schedules, stipulated at the instance of the respondent, from the deed record books of Polk County and it is not possible to trace petitioner's transactions definitely or accurately from those schedules. They contain patent errors and there are instances of conveyances involving the same pieces of property, without explanation therefor, and at times it is practically impossible to identify the parcels in conveyances in which petitioner was grantor with those in which he was grantee. Petitioner did testify generally that in 1925 and 1926 he indulged in some option trading, which would not appear on the county records, but what they were and the extent thereof, we are not advised. His explanation was that he would not attempt to say how much of such trading he did. In any event, that type of trading was limited, according to our understanding of his testimony, to the years 1925 and 1926, and did not, so far as appears, involve any of the properties here or those covered in the schedules of recorded conveyances.

On such state of the record, we have done the best we could to find and determine the facts, and as to the Real Estate Exchange Building and the Tampa lots, we are fully satisfied that the facts as found represent the true situation. The Tampa lots, although acquired in a transaction entered into for profit, within the meaning of section 23 (e) (2) of the Code, were not acquired and were never held primarily for sale to a customer or customers in the course of any trade or business carried on by petitioner, even though his operations in Polk County were such as to constitute a business conducted by him of buying and selling real estate. The Tampa lots were in no way connected with the transactions occurring or with the operations which petitioner had in Lake Wales and vicinity. Those lots in his hands were capital assets and the loss sustained upon their sale was a capital loss. The respondent's treatment of that loss is sustained.

We are also of the opinion that the respondent's position with respect to such loss as was sustained on the Real Estate Exchange Building is also sound. In his efforts to substantiate his claim that the property was held primarily for sale to customers in the course of his trade or business, the petitioner testified broadly that all of his properties, except his residence and original citrus grove property, were bought with a view to their resale and that they were for sale at all times. His counsel also elicited answers from his witnesses, a lawyer, a real estate operator, and an accountant, that it was their understanding that petitioner's properties were for sale at all times. Other answers, however, and petitioner's actual course of conduct with respect to the Real Estate Exchange Building give a clearer and more revealing view of the situation. Explaining his decision to con-

vert the garage property into an office building, petitioner stated that, due to the "great demand" for office space for which there were no facilities in Lake Wales, he would, by such conversion, have a revenue producing building which would be readily resalable. More important, however, than the purpose of acquisition "is the activity of the seller or those acting for him with reference to the property while held." *Dunlap* v. *Oldham Lumber Co.*, 178 F. 2d 781. And on cross-examination, petitioner's responses indicated that, as in the case of other rental properties he had acquired or constructed, the building would not be for sale when converted into rental property, unless or until he could sell it at a profit. In other words, he was, so to speak, providing a second string for his bow which could be availed of if his first failed him. When the Real Estate Exchange Building was completed, it would not be sold at a profit, and the petitioner added it to the other business buildings which had been bought or erected by him and made up the operating properties in his business of owning and renting business and office space to tenants. In short, it became one of the operating assets used in his rental business and was used and availed of for the production of rental income. See and compare *John D. Fackler*, 45 B. T. A. 708. In fact, petitioner rejected the offers of any and all potential customers for a period of 20 years and until its sale in 1946 in favor of its continued operation as a rental property. In reporting the rents received in the taxable years on the building, petitioner claimed and was allowed depreciation thereon, and there is no indication or suggestion that depreciation allowances were not similarly claimed and allowed for all prior years. We are not advised as to the offer or offers received in 1946, when the building was sold, nor as to petitioner's reasons for terminating the office renting operation by sale of the building even though it be sold at a loss.

The Real Estate Exchange Building, being a property used by petitioner in his rental business and of a character which is subject to the allowance for depreciation provided in section 23 (1), the treatment of the loss sustained from its disposition is governed by the provisions of section 117 (j) of the Code, and since the gain on such property in that year did not exceed the losses thereon, the loss was deductible in full, for the purpose of determining petitioner's taxable net income for 1946. That does not, however, make it a loss which may be carried over or carried back to subsequent or preceding years, under the provisions of section 122 of the Code. To qualify for a carry-back or carry-over, not only must the petitioner have had a net loss for 1946, but the net loss must have been a net operating loss, and in de-

termining a net operating loss, it is provided in section 122 (d) (5) [11] that deductions otherwise allowable which are not attributable to the operation of the trade or business, are allowable only to the extent of the amount of the gross income not derived from such trade or business. The loss here was not a loss attributable to the operation of the business, but to the sale of one of the operating assets used in the conduct of the business. Such a loss is not an operating loss, and cannot be, or make up, any part of a net operating loss. *Joseph Sic*, 10 T. C. 1096, affd. 177 F. 2d 469; *Lazier* v. *United States*, 170 F. 2d 521; *Smith* v. *United States*, 180 F. 2d 357; *Joseph L. Merrill*, 9 T. C. 291, affd. 173 F. 2d 310; *Joe B. Luton*, 18 T. C. 1153. The respondent's treatment of the loss is accordingly sustained.

Citing and relying on *Walter G. Morley*, 8 T. C. 904, the petitioner takes the position that the loss sustained by him in 1946, on the sale of the Real Estate Exchange Building, was not within the provisions of section 122 (d) (5) and was accordingly an operating loss. The evidence here shows, and we have found, as already noted, that from 1926 until it was sold the Real Estate Exchange Building was one of the operating properties used by petitioner in his business of renting office and business space to tenants, and in *Charles Weill*, 17 T. C. 318, we had occasion to consider the scope of the holding in the *Morley* case and there held that it did not apply where the loss sustained resulted from the sale of property used in a rental business. The facts being as they are, the same distinction applies in the instant case, and what we said in *Walter G. Morley, supra*, does not apply here.

The facts as to the 40 acres of land sold in 1944 are not so clear. As shown by our findings, petitioner had two thoughts in mind when he purchased the property in 1924. If the development of the residential district of Lake Wales moved in that direction, he would use the property for subdivision purposes, and if not, he would plant it and develop it into a grove property. He concluded that the residential district would not move in that direction and cleared and fenced the land for setting it in citrus fruit. If he had carried out that purpose, we would then have had a situation comparable to that of the Real Estate Exchange Building, since the facts show that begin-

[11] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

\*     \*     \*     \*     \*     \*     \*

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

\*     \*     \*     \*     \*     \*     \*

(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. \*   \*   \*

ning with the first orange grove, the 10 acres to the north of Lake Wales, he was in the business of owning and operating citrus groves for the production of income, until the business was liquidated by the sale of the groves, his operating properties, in the late 1930's and 1940's. The instant property was never set in citrus, however, due to the inability to get the stock therefor. Presumably such scarcity of stock was in the land boom period of 1925 and 1926, and petitioner has offered no explanation why it was not so set in later years, when stock did become available. Be that as it may, the land remained and continued to be unimproved acreage down the years, until it was sold in 1944. There is justification therefore for concluding that it was held for the same purpose as his other bare land and unimproved lots, excluding, of course, those pieces of property heretofore shown as having been improved by him and converted into rental or other operating properties.

Placing the instant property in the unimproved or idle land category, we are again confronted, in the main, with generalizations and conclusions as to the primary purpose for which they were held. Petitioner claims that these properties were held primarily for sale to customers at all times and that the only reason they were not sold in normal course was that after the land boom collapsed, in the latter part of 1926, there were no customers and therefore no sales. It is to be noted, however, that his proof does not even show that he actually made sales in 1925 and 1926, when, according to his own testimony, the real estate market in the Lake Wales area was "extremely active." He did state that he did do some option trading in that period, but his testimony falls far short of indicating such trading in any quantities. And besides, the trading here involved was not such trading. It is possible, however, in the light of the testimony that deeds usually followed sales by a considerable lapse of time, that those sales which were covered by the nine deeds executed by petitioner in 1927 and 1928 and apparently did cover vacant and unimproved property, were sales in the period of great real estate activity, and that, as claimed, other sales did not follow because of the almost non-existence of customers.

In spite of the thinness of petitioner's proof and the fact that he had the burden of proving that the acreage sold in 1944 was held primarily for sale to customers in the ordinary course of his trade or business, we are persuaded that as to some of his purchases and sales, he was making a business of it, and as to the unimproved properties purchased by him, excluding those which he himself improved and developed and devoted to other operations, the holding of them was primarily for sale to customers. We accordingly think that the proof does preponderate, even though slightly, in his favor and that

the 40 acres held in the unimproved land category were so held after his failure to get it set in citrus and up to the time of its sale in 1944. In our Findings of Fact we have so found. As to that sale, the petitioner is sustained.

As to the building sold in 1944 and on which he reported a gain of $1,789.36, petitioner offered no proof and made no argument on brief. We assume that he has abandoned his claim of error on the part of the respondent with respect thereto.

As to the residence in Highland Park, the parties apparently are in agreement that at the time the property was sold it was rental property and for 1945 the loss sustained was deductible in full. They are not in agreement as to the amount of the loss. The petitioner claimed a deductible loss of $11,230.35 on his return, of which the respondent disallowed $8,367.25 in his determination. The only error alleged by petitioner is that the respondent determined that the residence became rental property in 1935, instead of 1940, as reported and claimed by him. As to that claim, we think the evidence supports the petitioner, and we have so found. It is true that the petitioner did rent the property for periods of 3 months in both 1935 and 1936, receiving rent, which he reported in his income for those years. But, rather obviously, he had no thought or idea of changing the controlling and dominating purpose of holding the property from personal to business use. The renting of the residence for the short periods in the years mentioned was as a favor to the Highland Park Club, and more particularly to one of its members, and when petitioner and his wife saw the results of the occupancy, they refused similar requests in the years which followed. Such limited renting of the property in 1935 and 1936 was not, for the purposes here, an appropriation thereof to rental purposes. *Lloyd Jones*, 39 B. T. A. 531; *W. H. Moses*, 21 B. T. A. 226; *Claudian B. Northrop*, 17 B. T. A. 950.

On the record here, however, the above conclusion does not require or permit a decision that the respondent was in error in his disallowance of a portion of the loss deduction claimed. Petitioner's concern seems to be over the amount by which his cost or other basis is to be reduced by the depreciation "allowed (or allowable)," which would only date from the appropriation of the property from personal to rental use. If the property had been so converted in 1935, there would have been 10 years of depreciation "allowed (or allowable)," whereas conversion in 1940 would have allowed a reduction of basis by only 5 years of depreciation, and yet, the respondent only reduced the cost or other basis of the residence by depreciation allowances totaling $9,675, as against a reduction therefor of $9,056.25 by petitioner.

Actually the difference between the parties as to the amount of the loss sustained seems to be in the starting basis for the property. On his return, petitioner used $35,750 as his cost or other basis for the

property in 1940, presumably both land and building, whereas the respondent, in his determination, used a basis of $27,000 for the building and $1,500 for the land at January 1, 1935. It has long been settled that in the case of a residence converted to business use, its basis, for income tax purposes, is its value at the time it was appropriated for incoming producing purposes. Sec. 29.23 (e)–1 of Regs. 111.[12] See *Heiner* v. *Tindle*, 276 U. S. 582. Both petitioner and his accountant testified that the property had been appraised in 1940 for that purpose, although no proof was offered as to what the appraised value was. By reason of petitioner's computation of his loss, as shown on his 1945 return, we might assume that the appraised value was $35,750 but for the fact that in the depreciation schedule on the same return, as well as in his 1944 return, the cost or other basis for the house at 1940 was shown at $27,000, which was the same amount used by the respondent as the basis of the house 5 years earlier. And yet, as noted, the amount by which the petitioner would reduce the basis for depreciation for the 5-year period, 1940 to 1945, was $9,056.25, as compared with $9,675, the amount by which the respondent would reduce the basis for the 10-year period, 1935 to 1945. Whatever the explanation, it is hardly likely that the value of the house at both 1935 and 1940 would have been appraised at the same figure—$27,000. But if that could be possible, it would be equally difficult to explain the closeness of the depreciation figures, the one being for 5 years and the other for 10. In the respondent's determination, there is matter indicating that the major difference in the loss claimed and the loss allowed had to do with the furniture sold with the house, but, as heretofore noted, the results of the sale of the furniture have not been put in issue.

*Decision will be entered under Rule 50.*

---

[12] Sec. 29.23 (e)–1. Losses by Individuals.   *   *   *

A loss on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale is not deductible. If, however, property so purchased or constructed is prior to its sale rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss from the sale of the property, computed as provided in section 111, is, subject to the limitations provided in section 117, an allowable deduction in an amount not to exceed the excess of the value of the property at the time it was appropriated to income-producing purposes (with proper adjustment for depreciation) over the amount realized from the sale.