Thomas F. BERBEROVICH, individually and as sole beneficiary of the estate of Marion W. Berberovich, deceased, Plaintiff,

v.

A. M. MENNINGER, District Director of Internal Revenue for Michigan, Defendant.

Civ. A. 1599.

United States District Court
E. D. Michigan, N. D.
Jan. 18, 1957.

Heilman & Purcell, Saginaw, Mich., for plaintiff.

Frederick W. Kaess, U. S. Dist. Atty., by Elmer L. Pfeifle, Jr., Asst. U. S. Atty., Detroit, Mich., Charles K. Rice, Asst. Atty. Gen., for defendant.

PICARD, District Judge.

Plaintiff seeks to recover monies paid as income tax, assessed by defendant, on the theory that plaintiff's profit was ordinary income and not capital gain. The amount involved is not great and the facts are not seriously contested.

## Findings of Fact

In May, 1934, plaintiff, a successful physician and surgeon in Saginaw, Michigan for a number of years, purchased a 160 acre farm on the north side of State Street just outside the Saginaw city limits. At this point State Street runs east and west. The year following, plaintiff built a granary, calf barn, silo, and remodeled a dairy barn. In 1936 he added a road-side dairy. He called the farm "Long Acres Stock Farm" and sold milk and cream under the "Longacres" trade name. There is no doubt that plaintiff acquired this land to go into the dairy farming business which he operated incidental to his own profession until about 1941 when he sold his farm stock. From then on through 1947 he share-cropped or leased his farm neither of which arrangement was profitable.

At the time of his original purchase in 1934 there was but little residential building in the area between the farm and the city and to some extent beyond, but because of the increasing importance of the Saginaw and Bay Counties General Motors plants and of the Dow Chemical Company in Midland, building in the area has increased considerably since.

On March 17, 1947, plaintiff suffered a serious heart attack and was out of practice about a year. While in St. Mary's Hospital he was advised by his attending physicians that he would have to limit his activities so he decided to liquidate his farm. His secretary of years standing, Mrs. Rulison, was contacted and he advised her to have the premises sub-divided which she did—following which the sub-division was approved by the various governmental authorities so that roads would join up with those of adjoining areas and utility services be standardized.

It is apparent that plaintiff had at least two objectives. One was, to gradually liquidate his farm; and the other to give

(a) a parcel of land for a new Roman Catholic Church parish to be organized, the patron saint of which, St. Thomas Aquinas, Dr. Berberovich greatly admired, and

(b) after the church was assured or built he would (and did) give the entire sub-division two of his sub-divided property—½ of all his lots, to the church in trust so that the money could be utilized for the benefit of the church operations. But the church—Saint Thomas Aquinas—was built, not on parcel number two, but on parcel number one so that really more than half of his farm has been given away by plaintiff for church purposes and out of the other half, a large portion, approximately 12 lots, have been dedicated as a private park.

In 1948 plaintiff returned to build up a new practice and the sub-division being about ready in July of that year announcement thereof was made in the Saginaw News and the Catholic Weekly. The Catholic Weekly at that time had a very limited coverage and its worth as an advertising medium was questionable. A small wooden sign 4' x 8' was also placed on the sub-divided property which sign promptly blew down within three months. There has never been any further newspaper or other advertising and no other sign. As a matter of fact, in 1950 you could stand in the middle of that property and not know you were in a sub-division.

Plaintiff obtained no real estate license and all sales were made through Mrs. Rulison also without a real estate license; but Mrs. Rulison was given 5 per cent of any sale made for the extra work necessitated by showing the property, making collections and drawing papers. Plaintiff did no work in connection with the sub-division except to sign land contracts and deeds. He took no part in any sale nor did Mrs. Rulison make any effort at solicitation. Anyone desiring to purchase a lot would have to call on Mrs. Rulison at the plaintiff's office, generally after learning, from others, who owned the property.

The first year, the sub-division made 23 transactions covering the sale of 46 lots and 23 of those lots had been sold before the sub-division had ever been

advertised. These lots were sold to persons closely associated or related to plaintiff including two nurses with whom plaintiff worked. In 1946 only 6 sales were made, and in 1950, 10 sales. Still there was no advertising or solicitation.

Totalling all the sales of this property for the three years involved makes 39 or about 13 sales per year, including those to plaintiff's relatives, associates and personal friends and those sold in 1948, before the sub-division became official. Omitting those sold before the property was sub-divided would mean about 29 sales were made or less than one sale per month.

This suit concerns the tax for the year 1950 and when defendant contended that plaintiff was engaged in the real estate business as well as the medical profession plaintiff was obliged to report his profit as straight income. He paid the additional tax, made protest, and when his claim for refund was denied, brought suit in the proper manner.

### Conclusions of Law

■ Unless Congress intended, or our federal decisions have held, that whenever a taxpayer disposes of his farm by subdividing it into lots, he immediately and automatically is in the real estate business with income therefrom taxed as being received by him in the ordinary course of his trade or business we do not see how the government is justified in holding herein that plaintiff's gain is not a capital one. And unfortunately for defendant this has not been the holding of our courts nor the interpretation of Congress' intent of Section 117(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a) (1), made by those courts.

On the contrary it is the unquestioned law that when such property is sold by the taxpayer the question of whether it was sold

"in the ordinary course of his trade or business" to-wit—real estate, becomes essentially a question to be determined from the facts and circumstances of each case. See Shepherd v. United States, D.

C., 139 F.Supp. 508, affirmed 6 Cir., 231 F.2d 445 and cases cited under "First" below.

We find no claim by either party that this is not the law.

However, what do the courts desire to know and what "facts" are to some extent controlling as shown by their decisions?

■ That's another question, and we find that here plaintiff (under the great weight of authority) does not have any of the indicia of being in the real estate business although admittedly he could be both in the real estate business and be a physician and surgeon at the same time. Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781.

■■ So what are these indicia?

First: As to frequency, continuity and activity. Richards v. Commissioner of Internal Revenue, 9 Cir., 81 F.2d 369, 106 A.L.R. 249; Ehrman v. Commissioner of Internal Revenue, 9 Cir., 120 F.2d 607; Oliver v. Commissioner of Internal Revenue, 4 Cir., 138 F.2d 910; Brown v. Commissioner of Internal Revenue, 5 Cir., 143 F.2d 468; Home Co. v. Commissioner of Internal Revenue, 10 Cir., 212 F.2d 637; Friend v. Commissioner of Internal Revenue, 10 Cir., 198 F.2d 285, 46 A.L.R.2d 761; Mauldin v. Commissioner of Internal Revenue, 10 Cir., 195 F.2d 714; Palos Verdes Corp. v. United States, 9 Cir., 201 F.2d 256; Stockton Harbor Industrial Co. v. Commissioner of Internal Revenue, 9 Cir., 216 F.2d 638; and Blake v. Kavanagh, D.C., 107 F.Supp. 179.

One sale a month spread over three years hardly could be called frequent, continuous or "activity" especially when more than half of the sales were made in the first year.

Second: For what purpose was the property originally acquired and what is now the motive in selling?

Admittedly this property was purchased for a farm. Defendant does not dispute this. While "motive" was to liquidate by sub-dividing. (Winnick v.

Commissioner of Internal Revenue, 17 T. C. 538, reversed and remanded, 6 Cir., 199 F.2d 374, redetermined, 21 T.C. 1029, affirmed, 6 Cir., 223 F.2d 266). Commissioner of Internal Revenue v. Boeing, 9 Cir., 106 F.2d 305. If defendant does not admit this, we so find.

Third: To what extent were improvements made in the act of sub-dividing?

Very meager. The land had no great valleys or hills. There may have been some trees that had to be eliminated and roads and other utilities had to be added.

Fourth: To what extent was the sub-division advertised?

There was only one real advertisement during the life of the sub-division. Contrast this with Smith v. Dunn, 5 Cir., 224 F.2d 353 in which the taxpayer recovered.

Fifth: What relation did income from sales bear to taxpayer's total yearly income?

Not dwelled upon by either plaintiff or defendant but the amount involved is so small as to be almost infinitesimal in relation to plaintiff's entire income as a leading physician and surgeon, which position in Saginaw he quickly regained.

Sixth: How much of a business did taxpayer carry on?

Personally none and occasional sale is not enough. Snell v. Commissioner of Internal Revenue, 5 Cir., 97 F.2d 891.

Seventh: For what length of time was property held?

Since 1934 and property held for long time indicates intention of holding as investment. Palos Verdes Corp. v. United States, supra.

Eighth: Did taxpayer get a broker?

No—his secretary did all the work and was paid only 5 per cent commission. Ten per cent is the "going price" in that vicinity. Although she had no real estate license she really made all sales and all the help she got from taxpayer was "most general supervision". This might tend additionally to bring the case at bar under Smith v. Dunn, supra, decided in favor of taxpayer.

Incidentally, one of the cases cited by defendant, Dunlap v. Oldham Lumber Co., supra, appears to be more in favor of petitioner than the government because in that case the taxpayer in 1944–45 had lost on the sale of its lots. Defendant was in the lumber business and had acquired lots with the expectation that it would make money on a sub-division. The taxpayer's theory was that since it had lost on its real estate venture such sales of the lots were ordinary losses rather than losses resulting from sale of capital assets. It's the reverse of what is claimed in the case at bar but it is interesting to note that the court upheld the Commissioner who ruled that those sales were not in the ordinary course of business of the taxpayer but were losses resulting from sale of capital assets. Among the main facts noted as important in the Dunlap v. Oldham Lumber Company case were the "infrequent sales" made during those years. The same as herein. Surely, if the theory of Dunlap v. Oldham, supra, is correct the government cannot prevail in the case at bar.

Furthermore, it will be noted that the latest case cited by defendant, Home Co. v. Commissioner of Internal Revenue, supra, was passed upon by the tax court in a decision rendered in 1954. Most of the others were some time before that year and since those decisions a new trend in these type of actions seemingly prevails. In fact, even before Home Co. v. Commissioner of Internal Revenue, supra, one of the first cases disclosing the present trend was Daniel W. Ellis et al., decided on January 13, 1954 by the Tax Court of the United States, called Memorandum Decisions of the Tax Courts of the United States in Volume 23 of Prentice-Hall, 1954 Memorandum Decisions. In that case a physician inherited 160 acres of land, three miles out of Charleston and in 1946 sub-divided it into 72 lots. In the first year he sold 52 of the 72 lots and the same legal question was presented in that case as in the case at bar. And in deciding the issue the Tax Court laid down its own

criteria in determining whether the taxpayer's profit should be considered ordinary income or capital gain. That criteria was—

1. What was the reason for the taxpayer acquiring the property in question;

2. What were the sales activity of the taxpayer or those acting in his behalf, such as

(a) improving the property,

(b) soliciting sales by advertising, or

(c) more direct approach to prospective buyers;

3. What was the continuity of sales or sales related activities over a period of time; and

4. The number, frequency and substantiality of sales?

The plaintiff here meets every test.

The Tax Court laid emphasis on the fact that the taxpayer did not hire an experienced real estate man to make sales. He did hire one who was not experienced and gave him a 15 per cent commission, 10 per cent over what Dr. Berberovich allowed his office girl, also inexperienced in real estate transactions. Nevertheless the Tax Court decided the Ellis case, supra, which is much stronger in our opinion for the government than the present one—in favor of the taxpayer. In fact the Ellis case seems to be on all fours with the case at bar.

Still later, on June 30, 1955, the Court of Appeals in Smith v. Dunn, supra, 224 F.2d at page 353, again held that the taxpayer's profit was "capital gain" and not ordinary income although the taxpayer hired a real estate dealer at a 10 per cent commission. That case refers to a previous decision of Fahs v. Crawford, 5 Cir., 161 F.2d 315 and also Dunlap v. Oldham Lumber Co., supra, holding in favor of the taxpayer's contention.

As a result of what these recent cases all decide, and surely even in the old cases there is no great disagreement, we can think of no assembly of facts that could be conceived in a case of this type, that would be more favorable to the taxpayer than those in the case at bar.

We neglected to add that defendant's brief does claim that after 1950 more sales were made. The tax in question is for 1950. What may or may not have happened after that date is not before this court and if sales of lots progressed later as suggested by defendant, no stress was laid upon that issue until the abbreviated reference thereto in defendant's brief. But even if there were 82 sales after 1950 up to the time of trying this case in 1956 that would be less than one a month and could hardly be called continuous.

We must hold for the plaintiff.