Mrs. Alexander (Elizabeth C.) **GORDON** (1) and Elizabeth C. Gordon Trust, Mercantile-Safe Deposit and Trust Company, Trustee (2),

v.

**UNITED STATES.**

No. 461–55.

United States Court of Claims.
March 5, 1958.

David W. Richmond, Washington, D. C., for plaintiffs. Frederick O. Graves and Miller & Chevalier, Washington, D. C., were on the brief.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

PER CURIAM.

This case is before us on the report of Mastin G. White, a trial commissioner of our court, on exceptions to his report, and to his recommendation for the conclusion of law to be entered. The commissioner wrote an opinion expressing the opinion that neither Mrs. Alexander Gordon nor the trust was engaged in the real estate business in 1950 and 1951. He was of the opinion that the lots sold in those years did not constitute "property held by * * * [plaintiffs] primarily for sale to customers in the ordinary course of * * * [their] trade or business." They were sales made by plaintiffs in the process of liquidating property received by devise.

We agree with the commissioner's opinion, and concur in his recommendation. Plaintiff Mrs. Alexander (Eliza-

beth C.) Gordon (1) is entitled to recover $6,348.84, together with interest thereon as provided by law, and Elizabeth C. Gordon Trust, Mercantile-Safe Deposit and Trust Company, Trustee (2), is entitled to recover $6,122.42, together with interest thereon as provided by law.

It is so ordered.

### Opinion of the Commissioner

This case involves the question whether the profits realized by the plaintiffs in 1950 and 1951 from the sale of lots in a subdivision of the City of Baltimore, Maryland, should be regarded as capital gains or as ordinary income for income tax purposes. Under the pertinent statutory standard, the answer to the question depends upon whether the lots constituted "property held by the * * * [plaintiffs] primarily for sale to customers in the ordinary course of [their] trade or business".[1]

The subdivision referred to above was originally part of a 125-acre tract of land known as "The Orchards", which was acquired about 1900 by Douglas H. Gordon, Sr., as a site for a summer home. An attractive house was built by Mr. Gordon on the tract in 1902, and thereafter The Orchards was used as a summer home by the Gordon family from April to November of each year until September 1921.

Shortly after the house was built at The Orchards, Mr. Gordon gave the house and a 24-acre parcel of land surrounding it to his wife, Mrs. Elizabeth Clarke Gordon, who is one of the two plaintiffs in the present case.

Mr. Gordon died on April 8, 1918. His will, after providing for a number of legacies, bequeathed one-third of the residuary estate to Mrs. Gordon "for her sole and separate use", and he left two-thirds of the residuary estate in trust for Mrs. Gordon's benefit during her lifetime. The trust that was created by Mr. Gordon's will for the benefit of Mrs. Gordon is known as the Elizabeth C. Gordon Trust. It is the second plaintiff in the present suit, and will usually be referred to hereinafter as "the Trust".

The Orchards, except for the 24-acre portion that Mr. Gordon had given to Mrs. Gordon many years earlier, comprised part of Mr. Gordon's residuary estate. Hence, under his will, the 101 acres of The Orchards in the residuary estate were owned after Mr. Gordon's death by the plaintiffs in common, Mrs. Gordon having an undivided one-third interest and the Trust having an undivided two-thirds interest in the property.

In 1921, the plaintiffs (i. e., Mrs. Gordon and the Trust) leased approximately 46 acres of The Orchards to the Elkridge Hunt Club for a term of 99 years. The lease contains a provision whereby it may be perpetually renewed.

After September 1921, when Mrs. Gordon married again,[2] The Orchards was no longer used as a summer home by Mrs. Gordon or by any of the five children that had been born to Mr. and Mrs. Gordon.

During the period from September 1921 until 1928, the residence at The Orchards was rented to various persons from time to time by Mrs. Gordon, the owner. Such rentals were unsolicited by Mrs. Gordon, and were made by her without the assistance of a real estate agent. Persons desiring to rent the property customarily approached the corporate trustee under Mr. Gordon's will, and that company (which will usually be referred to hereinafter as the "Trust Company") handled the details of the rentals for Mrs. Gordon.

1. Sec. 1221(1), Internal Revenue Code of 1954 (26 U.S.C., 1952 ed., Supp. IV, 1221 (1)); formerly Sec. 117(a) (1), (A), Internal Revenue Code of 1939, as amended (26 U.S.C., 1952 ed., 117(a) (1) (A)). The quoted phrase, minus "to customers" and "ordinary", apparently had its origin in Sec. 208(a), Revenue Act of 1924 (43 Stat. 253, 263), 26 U.S.C.A. Int.Rev.Acts, page 13.

2. Hence, the name, "Mrs. Alexander Gordon", used in bringing this suit.

In the spring of 1928, Mrs. Gordon sold the house at The Orchards and the 24-acre parcel of land surrounding it (which she had received from Mr. Gordon as a gift many years earlier) to the Bryn Mawr School for $150,000. When it became known that the house at The Orchards had been sold, numerous inquiries were received by the Trust Company regarding the possibility of purchasing the remaining acreage at The Orchards, or parts of the land. As a result of one such inquiry, a tract of five acres was sold by the plaintiffs in 1928 for use as a home site.

Among those approaching the Trust Company regarding the possibility of purchasing all the remaining acreage of The Orchards was Gillet & Company, a real estate development company, which made an offer of $7,000 per acre for the property. That offer was accepted, and in 1929 the remaining 50 acres of The Orchards were sold by the plaintiffs to Gillet & Company for $350,000. The purchaser paid $50,000 in cash and gave a mortgage to secure the payment of the remainder of $300,000 due on the purchase price. The principal of the $300,000 indebtedness was payable in five years, and the interest rate was 5½ percent.

Gillet & Company subdivided the portion of The Orchards which it had purchased from the plaintiffs, constructed four concrete streets, with curbs and sidewalks, through the greater part of the property, and installed sewers and utilities. A fifth street was constructed except for paving the surface of the street. These improvements cost more than $102,000. Gillet & Company used "The Orchards" as the name of the subdivision.

Gillet & Company became hopelessly insolvent in the early part of 1933. At that time, the company had paid only $60,000 on the principal of its indebtedness to the plaintiffs and was in arrears on the payment of interest, and it had sold only six lots in The Orchards subdivision.

The mortgage on The Orchards subdivision was foreclosed by the plaintiffs on June 29, 1933, except for the six lots that had been sold by Gillet & Company (the mortgage had previously been released as to these six lots by the plaintiffs). The remaining 40½ acres of The Orchards subdivision were purchased by the plaintiffs at the foreclosure sale for $85,000, plus costs in the amount of $3,245.98, or a total of $88,245.98. Mrs. Gordon and the Trust again acquired the respective interests of one-third and two-thirds in the property.

After the reacquisition of the property in 1933, the plaintiffs did not sell or attempt to sell any part of The Orchards subdivision during a period of approximately three years. No offer for the purchase of the property was received during the three-year period, although the Trust Company received numerous inquiries as to whether the property was for sale. Among those displaying an interest in The Orchards was The Roland Park Company, which repeatedly approached the Trust Company and indicated a desire to handle the sale of lots in The Orchards for the plaintiffs.

At one time The Roland Park Company had been the great real estate development company of Baltimore, engaged in the business of purchasing large tracts of land, improving them, and subdividing the tracts for sale. The company was renowned for its restrictive covenants, the beauty with which its streets were laid out and landscaped, and the great care that it took in passing on architectural plans for homes in its subdivisions. During the period 1933–1936, however, The Roland Park Company was "broke" and in reorganization. It was no longer financially able to purchase, develop, and subdivide tracts of land itself, and, for that reason, it had begun to handle sales of real estate for other persons.

The plaintiffs ultimately decided to entrust the sale of lots in The Orchards subdivision to The Roland Park Company, because conditions began to seem favorable for the disposition of the prop-

erty and the plaintiffs desired to maintain, in connection with such disposition, standards comparable to those previously maintained by The Roland Park Company in the development and disposition of its own subdivisions.

At the plaintiffs' expense, the Roland Park Company changed the lot lines previously established by Gillet & Company for The Orchards (as it was thought that the lots established by Gillet & Company were too large to be marketed successfully under the economic conditions that prevailed when The Roland Park Company was given the task of selling the property), completed the street that had been partially constructed by Gillet & Company, and extended into a theretofore unimproved portion of The Orchards another street that had been constructed by Gillet & Company.

An agreement between the plaintiffs and The Roland Park Company was signed by the parties on July 20, 1936. There was attached to the agreement a list fixing minimum prices for the sale of lots in The Orchards. These prices had been proposed by The Roland Park Company and approved by the plaintiffs. It was provided in the agreement that The Roland Park Company could not sell lots at prices lower than the prescribed minimum prices without the plaintiff's permission, although the company could increase the minimum prices without permission. In connection with the sale of vacant lots, the company was to receive a commission of 15 percent of the sale price if it did not exceed the prescribed minimum price; and in the event of a sale at a price higher than the minimum price, the company was to receive the customary 15 percent on the portion of the sale price equivalent to the minimum price and, as added compensation, 50 percent of the increase above the minimum price.

Action was taken by the plaintiffs to make all unsold lots in The Orchards subject to covenants and restrictions similar to those that The Roland Park Company had customarily used in connection with its own subdivisions. These included provisions prohibiting the maintenance of nuisances on the property, the occupancy of the land by any Negro or person of Negro extraction (except Negroes employed as domestic servants by householders in The Orchards), the erection or use of buildings for business purposes (except at two specified locations), and the maintenance of "For Sale" or "For Rent" signs. No construction of any sort could be undertaken in The Orchards without first submitting the plans and specifications to, and securing the approval of, the plaintiffs.

The Roland Park Company owned a small piece of land that jutted into The Orchards at one point. The resulting jog in the boundary line of The Orchards at this point was eliminated as a result of an agreement between the company and the plaintiffs whereby the former sold this small piece of land to the plaintiffs for a nominal sum. The land thus purchased by the plaintiffs from The Roland Park Company was combined with contiguous land to form two lots in The Orchards.

The sale of lots in The Orchards by The Roland Park Company for the plaintiffs began in 1936 and extended through 1951. The plaintiffs did not participate in or supervise the company's sales activities, and they rarely consulted with the company. Although the plaintiffs had the power to disapprove prospective purchasers of lots in The Orchards and to disapprove plans for the construction of homes and other buildings in The Orchards, this power was never exercised, inasmuch as the plaintiffs had confidence in The Roland Park Company's judgment respecting these matters.[3]

During the period 1934–1956, the plaintiffs expended a total of $61,902.25

3. However, when a representative of Mrs. Gordon learned on one occasion that two lot owners were thinking of building two houses each on their respective lots, he announced that no plans that called for more than one house per lot would be approved.

in connection with the maintenance, development, and disposition of The Orchards subdivision. These expenditures were, for the most part, occasioned by maintenance and development work performed by The Roland Park Company at the expense of the plaintiffs.

The figure of $61,902.25 mentioned in the preceding paragraph included the sum of $700 that was spent by the plaintiffs on advertising relative to The Orchards. In addition, The Roland Park Company expended out of its earned commissions a total of $5,210.66 in advertising The Orchards. All advertising, including the expenditure of the $700 provided by the plaintiffs, was handled by The Roland Park Company. Most of the advertisements were run in the company's own magazine, a monthly that was distributed by the company gratis. The plaintiffs did not approve or review any of the advertisements, including those paid for out of the $700 provided by the plaintiffs.

Two signs were placed by The Roland Park Company on strategically located corner lots in The Orchards. These signs, which mentioned The Orchards and The Roland Park Company, were quite dignified in appearance, being attractively made and beautifully lettered.

During the period 1936–1951, there were 75 sales transactions in connection with the disposition of The Orchards by The Roland Park Company for the plaintiffs, and these transactions involved the sale of 112 lots or parts of lots. Sales of partial lots were usually due to the fact that persons who had previously purchased lots in The Orchards sometimes decided that they would like to have larger areas and, if there was an adjoining vacant lot, would purchase part of it.

Only 9 lots in The Orchards have been sold since 1951, 7 lots having been sold in 1952 and 2 in 1953. Approximately 9 acres of The Orchards remain unsold at the present time. Since 1954, this area has been held by the plaintiffs for sale as a single parcel.

The profits realized by the plaintiffs from the sale of lots in The Orchards were invested or applied to indebtedness. None of the profits was invested in real estate.

No land (other than the small area acquired from The Roland Park Company for inclusion in The Orchards) has ever been purchased by the plaintiffs. Except for the sale of The Orchards and the sale to the defendant during recent years of several thousand acres of land in Virginia at $3.15 an acre for inclusion in the Jefferson National Forest (the Virginia land was also acquired by the plaintiffs under Mr. Gordon's will), the plaintiffs have never sold any real estate.

The two years involved in this suit are 1950 and 1951. In 1950, Mrs. Gordon realized a profit of $4,366.56 from the sale of 2 full lots and 9 partial lots in The Orchards (this being approximately 13 percent of her total income for that year, exclusive of the income that she received from the Trust), and the Trust realized a profit of $9,141.86 on these sales (this being approximately 14 percent of the Trust's total income in 1950). In 1951, Mrs. Gordon realized a profit of $8,300.62 from the sale of 10 full lots and 5 partial lots in The Orchards (which was approximately 25 percent of her total income for that year, exclusive of the income that she received from the Trust), and the Trust realized a profit of $17,312.64 on the sales in 1951 (this being approximately 27 percent of the Trust's total income for that year).

In preparing their income tax returns for 1950 and 1951, Mrs. Gordon and the Trust reported the profits derived from the sale of lots in The Orchards as capital gains, and they computed and paid their respective income taxes on that basis. Subsequently, the Internal Revenue Service concluded that such profits constituted ordinary income rather than capital gains. The Internal Revenue Service thereupon assessed against Mrs. Gordon deficiencies of $1,597.95 and $3,741.97 for 1950 and 1951 respectively, and it assessed against the Trust respec-

tive deficiencies of $1,662.29 and $3,503.03 for those years.

Except for the plaintiffs' actions in treating the profits from the sale of lots in The Orchards as capital gains rather than as ordinary income, the Internal Revenue Service did not question—and the defendant in this litigation has not questioned—the correctness of any portion of the plaintiffs' income tax returns for 1950 and 1951.

The deficiencies were paid by the plaintiffs on February 4, 1955, together with interest payments by Mrs. Gordon in the amounts of $369.10 and $639.82 for 1950 and 1951, respectively, and interest payments by the Trust in the respective amounts of $375.65 and $581.45 for those years. Subsequently, on May 26, 1955, the plaintiffs filed claims for refund with the Internal Revenue Service. Then, no action having been taken by the Internal Revenue Service on their claims, the plaintiffs filed the present suit on December 5, 1955, seeking to recover $6,348.84 (plus interest) for Mrs. Gordon and $6,122.42 (plus interest) for the Trust.

The sales of the lots involved in this case were parts of a long-continued course of action adopted by the plaintiffs for the liquidation of a 101-acre tract of land which they had acquired under Mr. Gordon's will. During the process, the land was converted into cash and the cash was used for the payment of indebtedness and for investment in assets other than land. The essential nature of the project as a program of liquidation is not altered by the circumstances that the 50-acre parcel out of which the lots were carved was originally sold by the plaintiffs as a single parcel to Gillet & Company, that the plaintiffs, after the area had been subdivided by Gillet & Company, reacquired it through the process of foreclosing a mortgage that they held on the property to secure the payment of the major portion of the purchase price under their contract of sale with Gillet & Company, and that the plaintiffs thereafter proceeded to dispose of the land again in subdivided form. McConkey v. United States, 1955, 130 F.Supp. 621, 131 Ct. Cl. 690, 694.

Where sales are made by a taxpayer in the process of liquidating property received by bequest, devise, or inheritance, the taxpayer is ordinarily entitled to treat such sales as the disposition of capital assets. McConkey v. United States, supra, 130 F.Supp. at page 622, 131 Ct.Cl. at page 693; Garrett v. United States, 1954, 120 F.Supp. 193, 128 Ct.Cl. 100, 104. The fact that land received by devise or inheritance is disposed of piecemeal in the form of lots rather than by means of a single transaction does not affect this principle. Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, 357.

That the ordinary rule stated in the preceding paragraph should be followed in the present case seems clear when it is considered that the plaintiffs, in conducting the liquidation program, entrusted the disposition of the property to an independent real estate broker and did not themselves take an active part in the sales campaign (Smith v. Dunn, supra, 224 F.2d at p. 356; Phipps v. Commissioner of Internal Revenue, 2 Cir., 1931, 54 F.2d 469, 470–471; Fahs v. Crawford, 5 Cir., 1947, 161 F.2d 315, 317); that the sales transactions respecting the lots in The Orchards were not numerous or frequent, averaging less than five per year during the period 1936–1951 (Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781, 784–785); and that the plaintiffs' profits from the sale of lots in The Orchards represented relatively small proportions of the plaintiffs' total incomes (Camp v. Murray, 4 Cir., 1955, 226 F.2d 931, 933; Berberovich v. Menninger, D.C.E.D.Mich.1957, 147 F.Supp. 890, 893; cf. Thompson v. United States, 145 F.Supp. 534, 136 Ct. Cl. 671). In view of the factors just mentioned and the liquidation aspect of the case, it can hardly be said that the plaintiffs themselves were engaged in the business of selling lots. As previously

indicated, this is the ultimate question under the statutory standard of whether the lots involved in this case constituted "property held by the * * * [plaintiffs] primarily for sale to customers in the ordinary course of * * * [their] trade or business".

The fact that the plaintiffs made rather extensive expenditures in order to facilitate the sale of lots in The Orchards is entitled to consideration as a possible indication that the plaintiffs were engaged in the business of selling lots. Thompson v. United States, supra; Shearer v. Smyth, D.C.N.D.Cal.1953, 116 F.Supp. 230, 232, affirmed 9 Cir., 1955, 221 F.2d 478, certiorari denied 350 U.S. 840, 76 S.Ct. 78, 100 L.Ed. 749. However, this factor does not compel a conclusion different from that previously stated, since there is no single test that is determinative in all cases dealing with the problem of whether profits derived from sales of subdivided realty constitute capital gains or ordinary income. Garrett v. United States, supra, 120 F. Supp. at page 195, 128 Ct.Cl. at page 104; Mauldin v. Commissioner of Internal Revenue, 10 Cir., 1952, 195 F.2d 714, 716.

It is the policy of the income tax law "to relieve the taxpayer from * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions". Burnet v. Harmel, 1932, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. In the present case, I believe that it would be inconsistent with the quoted policy to tax as ordinary income the profits realized by the plaintiffs in the course of liquidating an area of land that they had received by devise.

It is my opinion, therefore, that the profits realized by the plaintiffs in 1950 and 1951 from the sale of lots in The Orchards should be regarded as capital gains, rather than as ordinary income, for income tax purposes. It necessarily follows that the plaintiffs are entitled to recover in the present action.