### HOUSTON DEEPWATER LAND CO. v. SCOFIELD, Collector of Internal Revenue.

#### Civ. A. No. 6175.

United States District Court
S. D. Texas, Houston Division.

Nov. 5, 1952.

Lockett & Lockett (J. L. Lockett), of Houston, Tex., for plaintiff.

Brian S. Odem, U. S. Atty. and W. R. Eckhardt, Asst. U. S. Atty., of Houston, Tex., for defendant.

CONNALLY, District Judge.

In this action, Houston Deepwater Land Company, the corporate plaintiff, seeks to recover a portion of its income taxes for the year 1944, which allegedly were erroneously and illegally assessed and collected. It presents for determination a single question; namely, whether the proceeds of a sale, under condemnation, of a tract of approximately 250 acres of land to an agency of the United States Government, constituted ordinary income of the taxpayer, as a sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" (as contended by the collector), or constituted sale of a capital asset, under Title 26 U.S.C.A. § 117 (a) (1).

The facts are not in dispute. Many are covered by a stipulation, to which I refer and adopt. The evidence offered on the trial consisted principally of the testimony of two officers of plaintiff, whose testimony is uncontradicted. Hence, disposition of the case requires an application of the admitted facts to the statutory definition, to determine whether the taxpayer is entitled to the benefits of the capital gains provision.

The 250 acre tract condemned by the Government is out of a tract of approximately 5,000 acres, referred to as the "Deepwater Lands". In the early 1920's, a life estate in this property was owned by W. E. Jones, with remainder to his son, M. Tilford Jones. W. E. Jones conveyed his interest to M. Tilford Jones by deed of December 24, 1924.

About 1925-1926, Mr. M. Tilford Jones suffered from a serious illness. In contemplation of the possibility of his own death, and the needs of his estate of ready cash in the event of that contingency, he consulted with counsel who advised the formation of the plaintiff corporation, and that

the Deepwater Lands be conveyed by Mr. Jones individually to the corporation, so that the land might be sold or encumbered free of administration as a part of his estate. The corporation was chartered in 1927, reciting as the corporate purpose "to erect or repair any building or improvement, and to accumulate money and lend money for said purposes, and to purchase, sell and subdivide real property in towns, cities and villages and their suburbs not extending more than two miles beyond their limits and to accumulate and lend money for that purpose". At all material times, Mr. M. Tilford Jones has owned all of the stock of plaintiff corporation.

After an unexplained delay of approximately two years, Mr. Jones conveyed the Deepwater Lands to the plaintiff corporation at a price reflected by the corporate records of $2,250,000. The 5,000 acre tract lies immediately south of the Houston Ship Channel and immediately east of the city of Pasadena, Texas. A portion lies within the corporate limits of Pasadena. The property has always offered highly desirable industrial sites along the ship channel and residential tracts in and near Pasadena. Since its acquisition by the corporation, the property has continued to enhance in value with the development of the entire area in which it lies.

With exception of the initial purchase of the 5,000 acres, the corporation has never purchased any land except as herein set out. In 1894, before the Deepwater Lands passed into the Jones family, the then visionary owner platted a subdivision including this property. Certain streets and easements were dedicated to the public use. Only a few of these lots were ever sold and the streets were never improved. Only a few were ever opened to use by the public. After the remainder of the Deepwater Lands was acquired by the Jones family, W. E. Jones and M. Tilford Jones undertook to reacquire the few lots so sold, which were surrounded by the other portions of the Deepwater Lands which they owned. The evidence is not clear whether all of these lots were reacquired by the Joneses individually, or whether a few were acquired after the property was conveyed to the plaintiff corporation. At any event, all were reacquired and title therein vested in the plaintiff. By appropriate proceedings before the Commissioner's Court, the subdivision of 1894 and the dedications of streets, etc., to public use were cancelled by the corporation. Such purchases of these small tracts, if in fact any were made by the corporation, I consider of little or no significance.

The corporation has, however, made a number of sales of property out of the Deepwater Lands. As these sales are detailed in the stipulation, it will suffice here to refer to them briefly. Four sales were made to members of Mr. Jones immediate family or to corporations which he or they owned or controlled.[1] These tracts were more or less carved from the center of the 5,000 acres. Seven other sales were made as arm's-length transactions.[2] With exception of the tract sold to the Navigation District in 1930, all of these tracts were along the westerly edge of the Deepwater Lands, and were within or

1. (1) Sale of 25.077 acres, 1935, to KTRH Broadcasting Company, consideration $7,523.10.

(2) Sale of 850 acres, 1936, to Mason Investment Company, consideration $382,500.

(3) Sale of 2 acres, 1940, to KTRH Broadcasting Company, consideration $800.

(4) Sale of .14.69 acres, 1942, to Audrey Jones, consideration $5,147.50.

2. (1) Sale of 354.252 acres, 1930, to Harris County Houston Ship Channel Navigation District, consideration $180,672.90.

(2) Sale of 8.829 acres, 1940, to John Garrett, consideration $6,180.30.

(3) Sale of 20.16 acres, 1941, to Pasadena Plumbing Company, consideration $6,985.44.

(4) Sale of 18.81 acres, 1942, to Federal Housing Administration, consideration $9,405.

(5) Sale of 18.171 acres, 1943, to Pasadena Plumbing Company, consideration $6,920.30.

(6) Sale of 215.454 acres, 1943, to James T. Taylor, consideration $86,181.60.

(7) Sale of 5.251 acres, 1944, to Tatar and Atkinson, consideration $2,500.

adjacent to the corporate limits of Pasadena. These sales were followed by the sale, under condemnation, of the 250 acre tract in question. This tract originally was leased by the plaintiff to a concern engaged upon the ship channel in the construction of vessels during the war years, and title was taken under condemnation for this purpose by the Government in October, 1944.

All of the sales referred to in footnote 2 above were effected without any sales activity whatsoever on the part of the plaintiff. The property was not listed with real estate agents nor was it advertised for sale. No "for sale" signs were erected on the property, and no improvements were placed there to enhance its marketability. In each instance, the purchaser sought out the officers of the plaintiff corporation and offered to buy the particular parcel for which such purchaser had a peculiar need. All such offers were considered by the plaintiff, and in those instances where the price was sufficiently attractive, the sales were consummated.

As to the inter-family sales, the evidence shows that the sale of 850 acres to Mason Investment Company, a corporation owned by the mother of M. Tilford Jones, was effected because of the need of the plaintiff corporation for funds to apply on its indebtednesses incurred in 1929. The other sales of this character were of small tracts, and were made by the corporation for reasons personal to Mr. Jones, its sole stockholder.

At all material times the land has been unimproved, except for a residence constructed by Mr. Jones for his own use. It has been principally devoted to grazing or agricultural purposes. The rentals received for grazing or farming leases have been nominal, and entirely disproportionate to the high value of the land. The utilization of the land for these purposes has simply been a stopgap device. The corporate officers have testified, and I find as a fact, that it has been the purpose of the corporation since it acquired this property to hold it as an investment; that it was considered by the corporate officers that it would continue to enhance in value; that at all times the corporation has expected eventually to sell the land in small parcels when the time seemed propitious, but that prior to 1944, it had not undertaken to do so and had not embarked on any sales program. At all times the land was for sale, in the sense that, if a purchaser desired a particular tract, and was willing to pay a sufficiently high price, the corporation would sell. It was never for sale prior to 1944, in the sense that the corporation was making any effort to put the land upon the market or to secure purchasers.

Under these facts, in my opinion, the case is controlled by South Texas Properties Co. v. Commissioner, 16 T.C. 1003; Adam Schantz Corporations v. Commissioner (Tax Ct. April 29, 1952, as yet unpublished); Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; and Farley v. Commissioner, 7 T.C. 198. The first cited authority, on strikingly similar facts, holds that the infrequent sales of unimproved real estate by a corporate taxpayer fell within terms of the capital gains provision. There, as here, the taxpayer was not actively engaged in the business of buying and selling land. The sales which were made resulted from activity of the purchasers, not the seller. The taxpayer purchased no property whatsoever except that which was acquired by foreclosure of liens, and its real business was the management, rental, and gradual liquidation of property owned by the members of a single family.

Counsel for the collector advances the argument, which to my mind is very forceful, that the taxpayer here was chartered for the very purpose of buying and selling real estate; that it has never been engaged in any other business, and that despite the infrequent and somewhat casual nature of the sales hereinabove referred to, nevertheless the selling of real estate was the corporation's business because it had no other; and thus that the property was held "primarily for sale to customers in the ordinary course of his trade or business". I have examined this argument carefully, but I decline to adopt it here. Had the taxpayer been engaged in the lumber business as its principal undertaking, as in

Dunlap v. Oldham Lumber Co., supra, or in the practice of law, as in Fahs v. Crawford, 5 Cir., 161 F.2d 315 (disregarding the fact that a corporation may not engage in the practice of law in this state) clearly the case would be controlled by those authorities, where more frequent sales and greater sales activities were present than here. The fact that this taxpayer had no such other and primary business, in my opinion, does not change the result.

 To remove the sale of an asset from the capital gains provision, the statute requires (a) that the taxpayer be engaged in the trade or business of making such sales; (b) that he have customers in the course of such business; and (c) that the asset be held *primarily* for sale to such customers in the ordinary course of such business. To meet these requirements, at least a minimum of selling and of sales activity must be present. While this will vary from case to case, in every instance it must be sufficient so that it may reasonably be said that the taxpayer is engaged in the business, has customers in such business, and that the property is held primarily for sale to such customers in the course thereof. I find that minimum to be wanting here. The land was not held in 1944 primarily for sale to the customers in the course of any business. It was used primarily for grazing purposes, and held as an investment, with the business of selling to customers to come later.

 The cases are uniform to the effect that a taxpayer may be engaged in several businesses, and if the purchase and sale of real estate command enough of the taxpayer's time and efforts, and if the purchases and sales are of sufficient frequency and are attendant with the usual indicia of real estate activity, he will be held to be engaged in that business, and the income taxed as ordinary income despite the fact that the taxpayer may devote more time or receive greater income from other ventures. White v. Commissioner, 5 Cir., 172 F.2d 629; King v. Commissioner, 5 Cir., 189 F.2d 122. In those cases, it was held that the minimum activity above referred to was present, without regard to whether this was the taxpayer's primary or his secondary undertaking. Similarly, where the minimum activity is not present, the rule should not change despite the fact that the taxpayer was not engaged in some other more lucrative and time consuming line of endeavor.

The cases cited by the collector are not to the contrary.[3]

Judgment will go for the plaintiff. The foregoing is adopted as Findings of Fact and Conclusions of Law. Clerk will notify counsel.

3. Brown v. Commissioner, 5 Cir., 143 F. 2d 468; Green v. Commissioner, 5 Cir., 141 F.2d 645; Fahs v. Crawford, supra; McFadden v. Commissioner, 5 Cir., 148 F.2d 570; Dunlap v. Oldham Lumber Co., supra; Rollingwood v. Commissioner, 9 Cir., 190 F.2d 263; Mauldin v. Commissioner, 10 Cir., 195 F.2d 714; King v. Commissioner, supra.