MARTIN et al.

v.

UNITED STATES.

Civ. A. No. 4653.

United States District Court
N. D. Georgia, Atlanta Division.

Jan. 7, 1954.

H. A. Stephens, Woodruff, Swift & Stephens, Atlanta, Ga., for plaintiffs.

James W. Dorsey, U. S. Atty., J. Ellis Mundy, Asst. U. S. Atty., Atlanta, Ga., for defendant.

SLOAN, District Judge.

Invoking the jurisdiction of this Court under the provisions of Title 28 U.S.C.A. § 1346(a), Howard C. Martin and Adelaide Martin, as plaintiffs, bring this complaint against the United States of America to recover income taxes alleged to have been erroneously and illegally collected from plaintiffs by defendant.

Plaintiffs contend that in the years 1948 and 1949 Howard C. Martin and one Mark A. Palmour, Jr., were in partnership and as a partnership owned real estate which was held by the partnership as capital assets and not primarily for sale to customers in the ordinary course of the partnership business. Plaintiffs contend that during said years of 1948 and 1949 said partnership sold real estate which resulted in gains to said partners. Plaintiffs contend that such sales were sales of capital assets as defined in Internal Revenue Code Section 117(a) (1), 26 U.S.C.A. § 117(a) (1), and the resulting gains were capital gains and only taxable as such under Section 117 (j) of the Internal Revenue Code.

Plaintiffs contend that they are husband and wife and that they filed joint returns of income for tax purposes in the years 1948 and 1949 and in said returns showed said gains as capital gains, and to be taxable as such.

Plaintiffs further contend that the Commissioner of Internal Revenue determined that the gains resulted from the sale of real estate held by the partnership primarily for sale to customers in the ordinary course of its business and that the distribution made from such gains to Howard C. Martin represented ordinary income and was taxable as such.

Plaintiffs contend that they did, on July 26, 1951, pay to Marion H. Allen, Collector of Internal Revenue for Georgia, the sum of $6,350.20 and the sum of $251.06, representing deficiencies in income taxes claimed to be due defendant by plaintiffs for the calendar years 1948 and 1949 respectively; that Marion H. Allen died September 10, 1952 and is no longer in office.

Plaintiffs contend that they did, on November 6, 1952, file with the Director of Internal Revenue for Georgia their claim for refunds of said amounts, specifying therein as grounds for recovery the facts as contended aforesaid and that said amounts have not been refunded to them, nor their claim rejected, although more than six months has elapsed since said payment was made and claim for refund filed.

The United States denies the allegations of the complaint and avers that the deficiency arose by reason of the Commissioner's determination that the gains resulting from the sale of real estate of the partnership was ordinary income rather than capital gains.

It was stipulated by the parties in open Court that the sole issue for determination by the Court is whether the properties sold by the taxpayer in the years 1948 and 1949, from which the gains were derived, was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business within the meaning of Section 117(j) (1) (B) of the Internal Revenue Code.

## Findings of Fact.

Prior to March 1, 1943, Howard C. Martin and Mark Allen Palmour, Jr., were neighbors, living across the street from each other in the City of Atlanta, Georgia. Palmour was a building contractor, while Martin operated a feed and grain brokerage business under the name of Theo. W. Martin and Son, first as a partner in that firm, later as sole owner. After the beginning of World War II, Palmour was unable to obtain materials with which to build and he went into the real estate business, working out of the office of Draper-Owens Company, real estate agents, and in one or more instances, with members of his family, bought and operated apartment houses with a view to letting the income from the properties pay for them.

Palmour reporting the success of such ventures to Howard C. Martin, Martin became interested and on or about the first of March, 1943, they formed a partnership in the ownership and management of certain real estate in the City of Atlanta, this partnership being formed under a written contract which has been destroyed and is not now available. However, on the first day of December, 1944, Howard C. Martin and Mark Allen Palmour, Jr., did enter into a written contract which stated that they had been partners since the first day of March, 1943 "in the ownership and management of certain real estate in the City of Atlanta." This contract stated that they desired to continue the business of the partnership and paragraph numbered one thereof provides in part: "The said partnership agreement shall extend to, embrace and cover all property that has been or may be purchased hereafter by the parties hereto in the names of both parties to this agreement, or in the partnership name and party of the second part (Mark Allen Palmour, Jr.) shall continue to manage, control and operate said properties of said partnership and collect the rents, issues and profits therefrom and out of the same shall pay the necessary charges for keeping the property insured and repaired and pay all taxes thereon, as long as they are owned by the parties hereto as partners." The contract further provided that the name of the partnership should be Martin and

Palmour and that the partnership should also conduct as partners the business under the name of the Peachtree Repair and Decorating Company and provided for the method of managing and operating said company. This contract provided in paragraph numbered 7 thereof "any one or more of the properties owned by the parties hereto may be sold at any time by mutual consent of the parties hereto and upon the sale of the last of said properties whatever net profit then remains or whatever net loss may be sustained on said properties shall be divided equally or paid by the parties hereto." The contract provided for an equal division of the profits in the event of liquidation, for an equal division of the profits from operations and for equal sharing of the losses and provided that the contract might be cancelled by either party upon ten days' written notice. This contract was in full force and effect during the years 1948 and 1949, the tax years here involved.

During the existence of this partnership, during the years 1943 and 1944, the partnership purchased some eleven pieces of property and sold none. During the years 1943 and 1944 and until January 26, 1945, no properties were sold. During the existence of this partnership the partnership bought some 33 pieces of real estate. This real estate consisted of apartment houses, stores, filling stations, a warehouse and some vacant property, acreage and lots. The partnership operated the property during the period that it held same, collected the rents and paid the sums received on the mortgage indebtedness or in defraying the expenses of operation. The 33 pieces of property were held for a total of 501 months, or an average of 15 months. The most profitable year of operation that this partnership had was during the year 1946, and in that year the partnership invested in stock of the Louisville Soy Products Company of Louisville, Kentucky, a soy bean oil mill, the sum of $60,000, and the Theo W. Martin and Son grain and feed brokerage

business of Howard C. Martin invested $30,000 in the stock of said company, these sums being by the partnership borrowed or withdrawn from funds on hand. Thereafter the oil mill failed and this investment was lost, both to the partnership of Martin and Palmour and to the Theo W. Martin Company. Thereafter the partnership was pressed for funds and was forced to raise money to pay sums borrowed to invest in the oil mill venture, to pay taxes and similar demands. During the year 1948, the partnership sold real estate and derived from such sales gains of $61,365.22, and during the year 1949 sold properties from which the partnership derived gains of $4,474.93, as follows:

1948

| | | |
|---|---|---|
| 2855 | Peachtree Road—acquired 2/2/46, sold 6/30/48—held 2 years, 5 months, Gain | $51,629.22 |
| 116 | Lafayette Drive—acquired 8/21/47, sold 7/30/48—held 11 months, Gain | 9,186.00 |
| | Lot at Doraville, acquired 9/13/44, sold 6/30/48—held 3 years, 9 months, Gain | .50.00 |
| 590 | Peachtree Street—adjustment of comm. | 500.00 |
| | Total | $61,365.22 |

1949

| | |
|---|---|
| Vermont Road—house—acquired 5/24/49 sold 10/27/49 (acquired by exchange of Wesley Road property) held 5 months Gain | $ 2,641.45 |
| Roxboro Circle—house—purchased 10/27/49, sold 11/14/49—held 1 month. (acquired by exchange for Vermont Road property above and cash). Gain | 1,833.48 |
| Total | $ 4,474.93 |

The returns of the partnership of Howard C. Martin and Mark A. Palmour, Jr., showed these gains and the return of Howard C. Martin and Adelaide Martin, plaintiffs herein, in their joint income tax return for the year 1948 report such receipts as capital gain rather than ordinary income and the individual tax return, the same being a joint return by Howard C. Martin and Adelaide Martin for the year 1949 likewise returns said gains as capital gains rather than ordinary income. Thereafter upon assessments on these income tax returns the Treasury Department, Internal Revenue Service, assessed additional taxes for the years 1948 and 1949 and on July 26, 1951 plaintiffs paid as additional taxes for the year 1948 the sum of $7,514.31 additional, $6,593.80 being additional tax with interest thereon of $920.51, and for the year 1949 paid the sum of $1,502.87 additional, $1,392.06 being additional tax and $110.81 being interest thereon. Thereafter, and on November 5, 1952, plaintiffs herein filed their claim for refund of said taxes, claiming that said taxes were illegally, erroneously or excessively collected, claiming a refund for the year 1948 of the sum of $6,350.20 and the amount to be refunded for the year 1949 of $231.06. Said amounts have neither been refunded to the plaintiffs nor has their claim therefor been formally rejected and more than six months have elapsed since the claim for refund was filed. Marion H. Allen, who at the time was Collector of Internal Revenue for Georgia, died on the 10th day of September, 1952.

It is conceded by all parties that the ultimate fact to be determined in this case is whether or not the properties sold by the partnership in 1948 and 1949 were properties held by the taxpayer primarily for sale to customers in the ordinary course of trade or business or whether they were sold as capital assets.

The following appears from the testimony of Howard C. Martin:

"Q. I believe that you testified on yesterday that none of these properties were bought for the purpose of resale, that you bought all of them for the purpose of operating the properties themselves? A. I wouldn't state that we didn't buy anything for the purpose of resale, but I said our prime purpose was to operate. Some we did buy, I mean, not for immediate resale but we bought with the idea of making a profit.

"Q. Of holding them for— A. During that process there were some that we sold within less than six months."

However, considering the record as a whole, it appears that:

In conducting the business of the partnership during a period of about eight years, 33 sales of property were made by the partnership. In this connection the evidence shows:

1. The taxpayer Howard C. Martin's usual and ordinary business has at all times been that of a feed and grain broker.

2. That the contract of December 1, 1944 states that the parties have since 1943 been partners "in the ownership and management of certain real estate in the City of Atlanta," the contract stating that they desire to continue the business.

3. That the partnership has never had or maintained an office or place of business.

4. That the partnership had no customers to whom it made sales of real estate and did no advertising of properties for sale.

5. The partnership was not licensed to deal in real estate and when it made sales it was the usual practice of the partnership to place the property in the hands of a licensed real estate dealer and to pay the usual sales commission on such sales.

6. It appears from the evidence that the usual method of the partnership arriving at a decision to sell a property was to discuss it between themselves and if it was mutually agreeable, it was agreed that the property would be sold.

**7.** These decisions to sell were induced by different factors, usually one or the other of the following:

(a) An unsolicited offer that the partnership felt was so good that it would not be good business to refuse it.

(b) A property that proved to be a "lemon" and they decided it should be disposed of.

(c) A desire at all times to improve their holdings by selling the least desirable and purchasing the most desirable property.

(d) When it had been decided that a piece of property would be sold, it was sometimes necessary to take in part payment other properties, such properties taken in part payment would usually be sold promptly.

(f) Finally, when it was decided to liquidate the partnership, all remaining real estate was sold.

From all of the facts and circumstances of this case, the Court finds that the properties sold by the taxpayer, Howard C. Martin, during the year 1948 and 1949 were not properties held for sale to customers in the ordinary course of the trade or business of the taxpayer.

### Conclusions of Law.

The question for determination is whether the real estate here involved, part of which was sold in 1948 and the remainder in 1949, can be said to have been "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," so as not to be included within the term of "capital assets" as defined in Section 117 of the Internal Revenue Code, 26 U.S. C.A. § 117. This is primarily a question of fact.[1]

The statute excludin g from the definition of "capital assets" property held by the taxpayer primarily for "sale" to customers in the ordinary course of business uses the word "sale" as including kindred transactions of exchange[2], while the word "business" as used in the statute means "busyness"—it implies that one is kept more or less busy, that the activity is an occupation[3].

The capital gains provisions in the income tax law are remedial provisions and were intended by Congress to alleviate the burden on a taxpayer where property has increased in value over a long period of time from having the profits from sales taxed at graduated tax rates designed for a single year's income, and the purpose is to protect investment property as distinguished from stock in trade or property bought and sold for a profit[4].

Certain well-recognized tests for the determination of the status of property as to whether "held by the taxpayer primarily for sales to customers in the ordinary course of business," have been laid down:

1. A most important factor is continuity of sales and sales related activity over a period of time.

2. Frequency of sales as opposed to isolated transactions has been emphasized and the word "business" as used in the statute implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation.

3. Activity of the seller or those acting under his instructions such as improvements or advertising to attract customers.

4. The extent or substantiality of the transactions.

5. The purpose of acquisition may be considered though not as controlling as the activity of the seller with reference to the property while holding it.

All of these tests may be applied and considered[5].

1. King v. C. I. R., 5 Cir., 189 F.2d 122.

2. Gruver v. Commissioner of Internal Revenue, 4 Cir., 142 F.2d 363.

3. Snell v. Commissioner of Internal Revenue, 5 Cir., 97 F.2d 891, 892.

4. Rollingwood Corp. v. Commissioner of Internal Revenue, 9 Cir., 190 F.2d 263 (5).

5. Dunlap v. Oldham Lumber Company, 5 Cir., 178 F.2d 781.

474

In determining this question, purposes for which the property was acquired, activities of the taxpayer and his agents with respect thereto, development and improvement of the property in readying it for sale, advertising for sale and frequency and continuity of sales are all factors which may be considered [6].

There is no fixed formula or rule of thumb for determining whether property sold by the taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business so that gain from such sale is taxable as ordinary income, but each case must rest upon its own facts. Factors to be considered are:

The purpose for which the property was acquired, whether for sale or investment, and continuity and frequency of sales as opposed by isolated transactions, and any other facts tending to indicate that sales or transactions were in furtherance of an occupation of the taxpayer.

A person actively engaged in business of real estate may discontinue such business and sell off remnants of his holdings without further engaging in the business, and gains from such sales would not be taxable as ordinary income.

The purpose for which the property was acquired is of some weight, but the ultimate question is the purpose for which the property was held [7].

This Court, giving full weight to the decided cases, has determined that the property of the taxpayer which was sold here, was not property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, so as to exclude said property from the definition of capital assets as provided in Section 117 of the Internal Revenue Code, 26 U.S.C.A. § 117. Such gains were capital gains and taxable only as such.

It being stipulated that this was the sole question to be determined in this case, and the plaintiffs' right to the refund, in the event the gains were held to be capital gains, being undisputed, a judgment for refunds as prayed may be prepared and presented.

6. Victory Housing No. 2, Inc., v. C. I. R., 10 Cir., 205 F.2d 371.

7. Mauldin v. C. I. R., 10 Cir., 195 F.2d 714.