Harchester Realty Corp. v. Commissioner.
Harchester Realty Corp. v. Commissioner
Docket No. 78344.
United States Tax Court
T.C. Memo 1961-184; 1961 Tax Ct. Memo LEXIS 165; 20 T.C.M. (CCH) 922; T.C.M. (RIA) 61184; June 21, 1961
*165 Seymour J. Wilner, Esq., 400 Madison Ave., New York, N. Y., for the petitioner. Robert S. Bevan, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax for the period ending December 31, 1952 and the year 1953 in the amounts of $2,940.89 and $106,171.77, respectively. The years 1954 and 1955 are also involved because of net operating losses sustained in those years which petitioner is entitled to carry back to the years 1952 and 1953. The issues presented for our consideration are: (1) Whether land sold by petitioner in 1952 and 1953 was held primarily for sale to customers in the ordinary course of trade or business; (2) what is the basis of the land sold; (3) whether petitioner may amortize in 1954 and 1955 a mortgage premium paid in 1956; (4) whether damages received by petitioner in 1955 should be taxed as ordinary income; and (5) whether expenses paid in 1954 and 1955 with respect to the real estate sales in 1952 and 1953 are capital losses in 1954 and 1955 if it is held that land was not held primarily for sale to customers in the ordinary course of trade or business. *166 Findings of Fact The stipulated facts are incorporated herein by reference. Petitioner was incorporated under the laws of New York on November 24, 1952 and filed its Federal income tax returns on a cash basis for the period ending December 31, 1952 and the years 1953, 1954 and 1955 with the director of internal revenue at Hartford, Connecticut. Petitioner's return for 1953 was filed on September 16, 1954 pursuant to extensions granted by the district director. On October 1, 1949, Leonard Davidow executed an Option Agreement with the executors of the Estate of Ogden Mills Reid, hereinafter referred to as the Reid estate, for the purchase of unimproved land in Harrison, New York, hereinafter referred to as the Harrison property. Under the terms of the Option Agreement and a Contract of Sale which was annexed to and made a part of the Option Agreement, Davidow was granted the right to purchase approximately 200 acres at a price of $1,500 per acre. The time during which Davidow could exercise the option to purchase the property was extended on three occasions by amending the Option Agreement. In the early part of 1950, the zoning of 130 acres of the Harrison property was changed *167 from residential to commercial. Thereafter, on June 1, 1950, Davidow exercised the option to purchase and made a $30,000 payment. The purchase contract was amended on July 25, 1951 more fully to describe the land being purchased. The Harrison property was acquired as part of a plan conceived by Davidow to assemble a number of parcels in the area and either to erect thereon buildings for lease or to lease the property on a net rental basis and allow the tenants to construct the building themselves subject to his approval. In furtherance of the plan, Davidow also acquired another parcel of 40 to 46 acres from the Reid estate across the road from the Harrison property. This acquisition was made by the Bansek Realty Corporation, of which Davidow was the president and sole stockholder. At the same time, A. C. Oaks, Inc., another corporation in which Davidow was the sole stockholder, acquired other contiguous land. On November 13, 1952, Davidow entered into a contract to sell 8.7845 acres of the Harrison property to the Allstate Insurance Company. This parcel is hereinafter referred to as the Allstate property. Davidow had been approached by Stephen Porter, a realtor representing Allstate *168 who wanted to purchase the parcel. Davidow told Porter of his plans to lease the property rather than to sell it. However, after a conference with an officer of Allstate who said it was the policy of his company not to lease, Davidow agreed to sell the desired parcel. Davidow at that time was trying to secure some type of financing to complete the transaction with respect to the Harrison property and Porter suggested that his father-in-law, Arthur Waterman, might take a mortgage on the property which would enable Davidow to close the title. A plan to finance the purchase was formulated by Davidow and Waterman, but title insurance could not be obtained. It was suggested that Davidow assign his contract with the Reid estate to a corporation formed by the Watermans. Under this plan, the Watermans would own all the corporation's capital stock, have all the officers and directors except one directorship which was to be held by Davidow, and an option to buy the capital stock for $200,000 would be given by the Watermans to Davidow. Pursuant to this plan petitioner was incorporated on November 24, 1952. The authorized stock of 100 sharees of no-par value common was issued on November 26, 1952. Rodney *169 H. Waterman and A. Porter Waterman each acquired 50 shares. The Board of Directors elected were as follows: Rodney H. Waterman A. Porter Waterman Stephen L. Porter Leonard H. Davidow All remained in office until November 28, 1956 when Rodney H. Waterman, A. Porter Waterman and Stephen L. Porter resigned and Benjamin Burstein and Henrietta Ciarmoli were elected directors to serve with Davidow. One directorship was left vacant. Rodney H. Waterman became president and treasurer of the petitioner and A. Porter Waterman its vice president and secretary. They continued in office until November 28, 1956 when Davidow became president and treasurer and Burstein, vice president and secretary. Thereafter, Davidow assigned to petitioner his option to acquire the Harrison property and also the contract to sell the Allstate property which petitioner expressly covenanted to perform. The Harrison property was conveyed to petitioner on November 25, 1952 and the $30,000 previously paid by Davidow credited against the purchase price. On November 28, 1952 petitioner conveyed the Allstate property for $100,394.15. The Allstate property had a basis of $40,000. On its Federal income tax return *170 for the period ending December 31, 1952, petitioner reported the profit from the sale of the Allstate property as ordinary income. The purchase of the Harrison property was financed by borrowing $395,000 from the S.C.R. Co., the stock of which was owned by the Watermans. The indebtedness was secured by two mortgages in the amounts of $335,000 and $60,000 on the Harrison property and also the property previously held by the Bamsek Realty Corporation and A. C. Oaks, Inc. which parcels were required by the Watermans to be conveyed to petitioner. The $60,000 mortgage was paid immediately from the proceeds of the Allstate sale. The mortgage of $335,000 required quarterly payment of interest at 1 percent per year commencing April 1, 1953. No rental income was received by petitioner in 1952 and its gross rent receipts in 1953 were $585. Although the agreement between Davidow and the Watermans contained a provision that the Harrison property could be sold at a price of $7,500 per acre or above, it was intended to be a security measure with respect to the loan to petitioner and the Watermans assured Davidow that they would carry out his plan for the property. On July 8, 1953, Davidow *171 exercised his option to acquire petitioner's capital stock from the Watermans. The terms of the Option Agreement were modified and Davidow was required to pay $211,500 for the stock. In the summer of 1953 a real estate broker from New York representing the Standard Vacuum Corporation approached petitioner about a tract contained in the Harrison property. The broker was searching for a site on which to construct a campus-type executive office building, but at that time he would not disclose the identity of his client. The parties did not come to an agreement and it was discovered that the broker was also negotiating for property elsewhere in Westchester County. A zoning change could not be effected as to the other property and the broker returned to petitioner and disclosed that his client was the Standard Vacuum Corporation who would not lease the property but rather wanted to buy it. After further negotiations, petitioner sold 55 acres of the Harrison property to Standard Vacuum's subsidiary Eastan Properties Corporation for $476,225.44. This property, hereinafter sometimes referred to as the Eastan property, had a basis of $85,000. The proceeds from this sale permitted petitioner *172 to meet its mortgage obligation with the S.C.R. Co. The only dispositions of property by petitioner since 1952 other than the sales to Allstate and Standard Vacuum were to an electric utility for a booster station in 1956, in lieu of condemnation; to the State of New York which condemned 25 acres for an expressway; and to a public utility which condemned an easement for a high power gas line. A number of companies were moving into the area and petitioner made substantial and continuous efforts to secure tenants for its property. A brochure was distributed by Porter's firm to other brokers in New York and Westchester County. Advertisements were also placed in area newspapers and signs were erected on the property. None of the advertising solicited sales of any part of the property and two offers to purchase parcels were refused. One lease was negotiated with a New York department store in 1954. However, no further attempts to solicit tenants were made in 1954 after it became apparent that the State of New York was going to build an expressway in the vicinity of the Harrison property, whose route at that time had not been definitely determined. On January 11, 1954, petitioner borrowed *173 $200,000 from the S.C.R. Co., Inc. and gave as evidence of its indebtedness a note for $250,000 payable in full on January 11, 1957. Interest at 5 percent was to be paid quarterly. Petitioner paid the principal sum of $250,000 in full on November 28, 1956. It amortized the $50,000 premium paid as follows: 1954
$16,203.70
1955
16,666.67
1956
16,666.67
1957
462.96
$50,000.00
In 1952 petitioner paid Allstate $15,000 as its share of the cost of black-topping an existing road on the Harrison property. Petitioner paid a commission of $30,000 on the land sold to Standard Vacuum in 1953 and incurred legal fees of $2,870 in connection with that sale. It also paid an additional commission of $3,750 in 1954. Also in 1954, petitioner in compliance with the contracts of sale, made payments to Allstate and Eastan of $31,893.19 which represented petitioner's share of the cost of installing water mains and constructing roads. In 1955 petitioner made additional payments required by the contract of sale of $3,994.90 to Eastan as its share of the amount expended in installing water lines. The parcel sold to Allstate bisected the northern section of the Harrison property. *174 It was accessible to the road and the most desirable location for building purposes in the northern part of the property. The Eastan property was the entire center section of the Harrison tract and the 55 acres which for the most part was zoned for industrial use was reasonably level land. The Commissioner determined that the gain realized on the sale of the Allstate property in 1952 which was reported by petitioner as ordinary income in the amount of $25,394.15 was understated to the extent of $42,804.20 computed as follows: Gross contract sales price
$100,394.15
Less: Allowed cost basis
$17,195.80
Construction cost of pri-
vate road
15,000.00
32,195.80
Net corrected gain
$ 68,198.35
Gain reported on return
25,394.15
Additional gain (ordinary income)
$ 42,804.20
The Commissioner with respect to 1952 also determined that petitioner failed to claim a net operating loss deduction of $58,679.41, such deduction being based on the carry-back of a net operating loss in the amount of $67,719.23 sustained by petitioner in 1954. In the alternative the Commissioner determined that if it is held that land was not held primarily for sale to customers *175 in the ordinary course of business thereby resulting in the gains realized on the sale being considered capital gains rather than ordinary income, the allowable net operating loss deduction for the period ending December 31, 1952 arising from a net operating loss carry-back from 1954 is $32,076.04, computed as follows: Net operating loss for year ended
December 31, 1954 as determined
in this statement
$67,719.23
Less: (a) Commissions expense
paid in 1954 on sale of
land in 1953 treated as
long-term capital loss
rather than as ordi-
nary deduction
$ 3,750.00
(b) Construction costs paid
in 1954 for installation
of water lines and road
construction in respect
to land sold in 1952
and 1953 treated as
capital loss rather than
as ordinary deduction
31,893.19
35,643.19
Net operating loss allowable as
carry-back to period November 28,
1952 to December 31, 1952
$32,076.04
As to 1953, the Commissioner determined that the land held by petitioner was property held primarily for sale to customers in the ordinary course of trade or business and the gain realized on the sale to Standard Vacuum was improperly reported as a longterm captial gain, which *176 caused the reported gain to be understated to the extent of $180,134.36 computed as follows: Gross contract sales price
$476,225.44
Less: Corrected cost basis
$76,425.07
Commissions
30,000.00
Legal fee
2,870.00
109,295.07
Net corrected gain (ordinary income)
$366,930.37
Long-term capital gain reported on
return
186,796.01
Additional gain
$180,134.36
The Commissioner also determined that petitioner failed to claim a net operating loss deduction of $55,588.46 for 1953, such deduction being based on the available carry-back of a net operating loss in the amount of $9,039.82 for 1954 and $46,548.64 for 1955. In the alternative the Commissioner determined that if it is held that the land is not properly held primarily for sale to customers in the ordinary course of trade or business, thereby resulting in the gains realized being considered capital gains, petitioner is not entitled to any net operating loss carry-back for 1954 and the allowable net operating loss for 1953 arising from the net operating loss carry-back for 1955 amounts to $42,553.74 computed as follows: Net operating loss for year ended
December 31, 1955 as determined
in this statement
$46,548.64
Less: (a) Construction costs paid in
1955 for installation of
water lines in respect to
land sold in 1953 treated
as long-term capital loss
rather than as ordinary
deduction
3,994.90
Net operating loss allowable as carry-
back to year ended December 31,
1953
$42,553.74
*177 The Commissioner determined with respect to 1954 that an insurance expense of $711.98 claimed as a deduction was allowable only to the extent of $462.88 as the remainder represented prepaid premiums. The Commissioner also determined that a legal expense of $1,270.50 claimed as a deduction was a capital expenditure and $16,203.70 claimed as a deduction for amortization of mortgage expense did not constitute an allowable deduction. The Commissioner determined with respect to 1955 that $16,666.67 claimed as a deduction for amortization of mortgage did not constitute an allowable deduction and that damages of $1,212.50 received by petitioner from the condemnation of part of its property for a gas line which was reported as a capital gain was in actuality ordinary income. For 1955 the Commissioner determined that petitioner was entitled to an additional deduction of $241.50 for insurance expense. Opinion The first issue presents again the question of whether real estate was held for investment or whether it was held for sale in the ordinary course of trade or business. Petitioner in contesting the Commissioner's determination that the property in question was held primarily for *178 sale to customers in the ordinary course of trade or business within the meaning of section 117(a)(1), Internal Revenue Code of 1939 argues that the property was acquired pursuant to an investment venture, which was to assemble an industrial park for the leasing of building sites and that a single, fortuitous, unsolicited sale compelled by financial necessity is not sufficient to put petitioner in the business of selling real estate. As a preamble to our resolution of whether the gains realized from such sales are taxable as gains from the sale of capital assets or as ordinary income from the sale of property held by taxpayer for sale to customers in the ordinary course of his trade or business, we have repeatedly observed that it is primarily a question of fact to be resolved in the light of all the attendant facts and circumstances. Even though each case is composed of its own unique factual situation, certain guideposts have been developed upon which the courts have come to rely in chartering their course to a proper result. These guideposts are: the purpose for which the land was acquired, the purpose for which the land was held and the purpose for which the land was held at *179 the time of the sale; the continuity of sales or sales related activity over a period of time; the volume and frequency of sales over a period of time as well as their substantiality with respect to the other sources of income of the taxpayer and the extent to which the taxpayer or his agents engaged in sales activities by developing or improving the property, soliciting customers and advertising. W. T. Thrift, Sr., 15 T.C. 366 (1950); James G. Hoover, 32 T.C. 618 (1959); Boomhower v. United States, 74 F. Supp. 997 (N.D., Ia. 1947). In the instant case, it is necessary, of course, to apply these objective criteria to the facts presented in order to ascertain whether they are consistent with the announced subjective intent of petitioner. The Commissioner argues that petitioner was in the real estate business and under its corporate charter was empowered to sell real estate and that substantially all petitioner's income for the years at issue was derived from sales of real estate. The corporate power to sell has little weight without a corresponding volume and continuity of sales to demonstrate that the power is being actively exercised. Houston Deepwater Land Co. v. Scofield, 110 F. Supp. 394 *180 (S.D., Tex. 1952); South Texas Properties Co., 16 T.C. 1003 (1951); Camp Mfg. Co., 3 T.C. 467 (1944). As we see it, the substantiality of income must be considered in conjunction with the sales activity which is the most important single indicator that the property was held primarily for sale to customers in the ordinary course of trade or business. Dunlap v. Oldham Lumber Co., 178 F. 2d 781 (C.A. 5, 1950). Although the income here was derived from real estate sales, the income in each year represented the proceeds from a single sale and we think the weight to be afforded this factor, the substantiality of income, must be tempered by the sale activity that occurred. Similarly in Houston Deepwater Land Co. v. Scofield, supra, 397, a case in which it was argued that the taxpayer was chartered for the very purpose of buying and selling real estate, the court said: Counsel for the collector advances the argument, which to my mind is very forceful, that the taxpayer here was chartered for the very purpose of buying and selling real estate; that it has never been engaged in any other business, and that despite the infrequent and somewhat *181 casual nature of the sales hereinabove referred to, nevertheless the selling of real estate was the corporation's business because it had no other, and thus that the property was held "primarily for sale to customers in the ordinary course of his trade or business". I have examined this argument carefully, but I decline to adopt it here. Had the taxpayer been engaged in the lumber business as its principal undertaking, as in Dunlap v. Oldham Lumber Co., supra, or in the practice of law, as in Fahs v. Crawford, 5 Cir., 161 F. 2d 315 (disregarding the fact that a corporation may not engage in the practice of law in this state) clearly the case would be controlled by those authorities, where more frequent sales and greater sales activities were present than here. The fact that this taxpayer had no such other and primary business, in my opinion, does not change the result. To remove the sale of an asset from the capital gains provision, the statute requires (a) that the taxpayer be engaged in the trade or business of making such sales; (b) that he have customers in the course of such business; and (c) that the asset be held primarily for sale to such customers *182 in the ordinary course of such business. To meet these requirements, at least a minimum of selling and of sales activity must be present. While this will vary from case to case, in every instance it must be sufficient so that it may reasonably be said that the taxpayer is engaged in the business, has customers in such business, and that the property is held primarily for sale to such customers in the course thereof. * * * Cf. Friend v. Commissioner, 198 F. 2d 285 (C.A. 10, 1952) affirming a Memorandum Opinion of this Court; White v. Commissioner, 172 F. 2d 629 (C.A. 5, 1949) affirming a Memorandum Opinion of this Court. Our findings of fact clearly illustrate that the sale of the Allstate property in 1952 was not negotiated by petitioner. This leaves the sale to Standard Vacuum in 1953 as the only transaction in which petitioner was an active participant. We do not believe the sale of one parcel in an 8-year period is sufficient to establish any volume or frequency of sales or continuity of sales or sales related activity. Dunlap v. Oldham Lumber Co., supra.See also Curtis Co., 23 T.C. 740 (1955). The Commissioner theorizes *183 that knowledge in 1954 of a proposed expressway in the vicinity whose route had not at that time been definitely established was the cause of the cessation of further sales. This knowledge of a proposed expressway insofar as this case is concerned would seem to have a neutralizing effect, as it would not only explain the absence of future sales but it would also explain why petitioner was unable to obtain leases for the property. Continuing, with respect to sales activity, the Commissioner contends that petitioner was not passive but actively solicited sales through the brochure which was circularized to various real estate firms, the signs it erected on the property and the advertisements it placed in area newspapers. The record is barren of any evidence that in any of the advertising media utilized there was a solicitation of sales. Furthermore, Porter whose firm handled the advertising testified that the "promotional efforts" were "to endeavor to obtain people that would net-lease land." He testified further that he was "never given authority to offer the property for sale" and that an offer to buy a parcel in 1955, 2 years subsequent to the sale to Standard Vacuum, was rejected *184 because "it wasn't for sale" but "to lease." In South Texas Properties Co., supra, 1009, this Court in reaching its result that the property was not held for sale to customers in the ordinary course of trade or business said that a controlling factor was that: Petitioner maintained no price list, employed no salesman to conduct its sales, and had no established office procedure but instead each purchaser's offer was considered by petitioner's board of directors. Only a few sales of unimproved real estate were made by petitioner during the taxable years. Such facts strongly indicate that the real estate was not held by petitioner for sale to its customers in the ordinary course of its trade or business. See also Frieda E. J. Farley, 7 T.C. 198 (1947); Thomas E. Woods, 16 T.C. 213 (1951); Austin v. United States, 116 F. Supp. 283 (S.D., Tex. 1953). Cf. Snell v. Commissioner, 97 F. 2d 891 (C.A. 5, 1938); Arthur E. Wood, 25 T.C. 468 (1955). The Commissioner also calls attention to the fact that petitioner under the terms of the contracts of sale made contributions to Allstate and Standard Vacuum which *185 represented its share of the cost of improvements made by Allstate and Standard Vacuum. These contributions were predicated upon the premise that the improvements, the resurfacing of a road and the installation of water lines, were of a type which not only benefited the specific tracts but which were also beneficial to the remaining property and therefore petitioner should share in their costs. They were not improvements made in order to make the property more saleable or in contemplation of a specific sale and we think on this ground the situation is distinguishable from those cases in which expenditures for improvements were relevant factors bearing upon the final disposition of the case. Cf. George W. Longfellow, 31 T.C. 11 (1958); Shearer v. Smyth, 116 F.Supp. 230 (N.D., Cal. 1953); Brown v. Commissioner, 143 F. 2d 468 (C.A. 5, 1944), affirming a Memorandum Opinion of this Court. Finally, the Commissioner points out that petitioner reported the Allstate sale as ordinary income on its 1952 return and concludes that it is evidence of petitioner's intention to engage in the real estate business because if petitioner had intended to treat the *186 Harrison property as a capital asset, the gain from the Allstate sale would have been reported as a short-term capital gain. We do not think this is significant as it is not substantiated by the surrounding facts. The evidence, as we view it, shows that the area was developing and the property had definite speculative value. The fact that petitioner accepted an offer which it thought to be too good a proposition to turn down and which would have enabled it to stabilize its financial position is not necessarily inconsistent with an investment theory. Martin v. United States, 119 F. Supp. 468 (N.D., Ga. 1954); Martin Dressen, 17 T.C. 1443 (1952). In Nelson A. Farry, 13 T.C. 8 (1949) this Court was confronted with the sale of rental properties; in holding that capital gains resulted we said at page 13 The fact that in the taxable years [the taxpayer] received satisfactory offers for some of [the properties] and sold them does not establish that he was holding them primarily for sale to customers in the ordinary course of his trade or business. We are convinced that petitioner acquired the property as an investment, namely, to lease for *187 industrial building sites, and has never to date departed from this primary objective. Carl Marks & Co., 12 T.C. 1196 (1949). We reject, as unsupported by the evidence, the contention that the property was held for the dual purpose of sale or lease. Accordingly, it follows that petitioner did not hold the property in question for sale to customers in the ordinary course of its trade or business. The second issue concerns the basis of the Allstate and Eastan properties at the time of sale. The Commissioner contends that the basis of the Allstate property was $35,000 and the basis of the Eastan property was $83,000. On the other hand, petitioner claims the Allstate property had a basis of $87,736.45 and the basis of the Eastan property was $106,220.66. Both parties introduced expert testimony with respect to this valuation question. Without reference to the probative value of the testimony, the one conclusion that can be gleaned from the testimony of both witnesses is that a higher per acre value should be ascribed to the Allstate property than contiguous parcels due to its level terrain and accessibility to the road. In light of this testimony we have found as a fact *188 that the Allstate property had a basis of $40,000. A divergence of views exists with respect to the Eastan property. The crux of the disagreement centers around the proper date of valuation. The Commissioner contends that it should be in 1949 when Davidow obtained the option which set the purchase price for the Harrison property. In contrast petitioner argues that the valuation date should be in 1952 because to apportion the basis as of October 1, 1949, as claimed by the Commissioner, would disregard the 1950 zoning change. We have found as a fact that the Eastan property had a basis of $85,000. Petitioner's argument that 1952 is the proper date of allocation in order to take into account the rezoning of the property has no merit. In Wellesley A. Ayling, 32 T.C. 704, 711 (1959), the taxpayer made a similar contention which we answered by saying We agree with respondent that petitioners' method of allocating the basis of undeveloped land to individual lots is not logical because numerous factors may enter into the picture between the time the land is purchased and the last lot is sold which might increase or decrease selling prices, whereas the basis must be allocated *189 to the various lots as of the date the land was acquired. The third, fourth and fifth issues relate to the years 1954 and 1955 as petitioner sustained net operating losses in those years and is entitled to net operating loss deductions in 1952 and 1953. The third issue pertains to the amortization of a mortgage premium. In 1954 petitioner borrowed $200,000 from the S.C.R. Co. and gave a $250,000 note to evidence its indebtedness. It repaid the note in full in 1956. For the years 1954 and 1955 petitioner amortized the premium of $50,000 and claimed deductions of $16,203.70 and $16,666.67, respectively. The Commissioner disallowed the deductions for both years and contends that inasmuch as petitioner is on a cash basis, it is only entitled to a deduction for the year in which the note was paid. In L-R Heat Treating Co., 28 T.C. 894, 897 (1957) this Court held that a bonus or premium paid for making a loan was interest saying "the fact that the parties did not call the premium or bonus interest and that the petitioner did not treat the bonus or premium on its books as interest is * * * immaterial." In view of our holding in L-R Heat Treating that a premium or bonus *190 is considered for tax purposes as interest, the Commissioner's determination must be sustained on this issue as it is well settled that a deduction for interest is allowable to a taxpayer on the cash basis only when he pays it. John C. Cleaver, 6 T.C. 452 (1946), affd. 158 F. 2d 342 (C.A. 7, 1946), certiorari denied 330 U.S. 849 (1947); A. O'Day, 20 B.T.A. 455 (1930). The fourth issue relates to a long-term capital gain of $1,212.50 reported by petit9oner on its 1955 corporate income tax return and described as "Damages-gas line West Chester Ave." The Commissioner determined that the amount designated "damages" was ordinary income. No evidence was introduced with respect to the nature of or circumstances surrounding the "damages." The petitioner has failed to sustain its burden of proof on this issue. Accordingly, the determination of the Commissioner is sustained. The fifth issue presented is whether certain expenses paid in 1954 and 1955 with respect to the real estate sales in 1952 and 1953 are to be treated as capital losses in the years 1954 and 1955. The expenditures, namely, a commission of $3,750 paid in 1954 and construction *191 costs of $31,893.19 and $3,994.90 paid in 1954 and 1955, respectively, were reported by petitioner on its Federal corporate income tax return for the years 1954 and 1955 as capital losses. Similarly, the Commissioner in the statutory notice of deficiency sent to petitioner determined that if it was held that the land owned by petitioner was not held primarily for sale to customers in the ordinary course of petitioner's business, the expenses represented nondeductible capital losses as shown on petitioner's return. However, in its petition to this Court petitioner changed its position and alleged that the "expenditures constitute expenses of the sales in 1952 and 1953 and reduce the gain on said sales in the years when the two sales were respectively made." Consistent with its position in the petition, petitioner asserts that the expenses paid in 1954 and 1955 should not be treated as capital losses in those years but rather that the amounts should be deducted from the gain reported on the sales in 1952 and 1953. We do not agree. An annual accounting of income is a prime factor in facilitating the collection of the Federal income tax. The Supreme Court in discussing its importance *192 in Burnet v. Sanford & Brooks Co., 282 U.S. 359, 363 (1931) commented: It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation. Petitioner argues that the method it proposes should be adopted so as not to distort taxable income. We realize insofar as a cash basis taxpayer is concerned that when an annual accounting system is employed it results in the "denial both to government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment." Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 286 (1944). When this problem was posed to the Supreme Court in Healy v. Commissioner, 345 U.S. 278, 284 (1953) it stated that: The inequities of treating an amount as income which eventually turns out not to be income are urged upon us. * * * In some cases, this treatment will benefit the taxpayer; in others it will not. Factors such as *193 the tax rates in the years involved and the brackets in which the income of the taxpayer falls will be controlling. A rule which required that the adjustment be made in the earlier year of receipt instead of the later year of repayment would generally be unfavorable to taxpayers, for the statute of limitations would frequently bar any adjustment of the tax liability for the earlier year. Congress has enacted an annual accounting system under which income is counted up at the end of each year. It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system. This basic principle cannot be changed simply because it is of advantage to a taxpayer or to the Government in a particular case that a different rule be followed. In a case before this Court, Roberta Pittman, 14 T.C. 449 (1950) the taxpayer was a transferee of a corporation dissolved in 1945. The sole issue was whether the taxpayer was entitled to deduct the Federal income tax on the corporation paid by her in 1947 from the gain *194 she realized in 1945 on the liquidation of the corporation. In the course of our holding, that the tax on the corporation paid in 1947 could not be used as a deduction in the computation of the taxpayer's income for 1945, we stated at page 452 that If the petitioner's contention, that the capital gain should be adjusted, were to be followed, the result would be to hold in abeyance the final determination of the capital gain on a corporate dissolution until the final corporate income tax had been paid. This would place an unwarranted burden on the tax collection process. We think that the rationale in Pittman is applicable to the instant case. The utilization of the method of computation proposed by petitioner "would hold in abeyance the final determination of the capital gain" on the sales until all the expenses incident to such sales "had been paid" and "would place an unwarranted burden on the tax collection process." We conclude that the determination of the Commissioner that the expenditures represented capital losses in 1954 and 1955 is correct. Decision will be entered under Rule 50.